**KIRBY McINERNEY, LLP**
Ira M. Press (admitted *Pro Hac Vice*)
Thomas W. Elrod
825 Third Avenue, 16th Floor
New York, NY 10022
Telephone:  (212) 371-6600
Facsimile: (212) 751-2540
Email: ipress@kmllp.com
Email: telrod@kmllp.com

**LEVI & KORSINSKY LLP**
Nicholas I. Porritt
Adam M. Apton
1101 30th Street NW, Suite 115
Telephone:  (202) 524-4290
Facsimile: (202) 337-1567
Email: nporritt@zlk.com
Email: aapton@zlk.com

*Co-Lead Counsel for Plaintiffs*

**GLANCY PRONGAY & MURRAY LLP**
Lionel Z. Glancy (#134180)
Robert V. Prongay (#270796)
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
Email:  lglancy@glancylaw.com
Email:  rprongay@glancylaw.com

**WESTERMAN LAW CORP**
Jeff S. Westerman (#94559)
1875 Century Park East, Suite 2200
Los Angeles, California 90067
Telephone: (310) 698-7880
Facsimile: (310) 775-9777
Email:  jwesterman@jswlegal.com

*Liaison Counsel for Plaintiffs*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION

|  |  |
|---|---|
| In re RESONANT INC. SECURITIES LITIGATION | Master File No.  15-cv-01970 SJO (VBKx) **CONSOLIDATED SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** **JURY TRIAL DEMANDED** |

CONSOLIDATED SECOND AMENDED CLASS ACTION COMPLAINT

## **TABLE OF CONTENTS**

I.      NATURE OF THE ACTION AND OVERVIEW ......................................... 1

II.     JURISDICTION AND VENUE ...................................................................... 8

III.    PARTIES      ...................................................................................................... 9

        A.     Plaintiffs ..................................................................................... 9

        B.     Defendants ................................................................................ 10

        C.     Relevant Non-Parties ............................................................. 11

IV.     CLASS ACITON ALLEGATIONS ............................................................ 12

V.      FACTUAL BACKGROUND FOR SUBSTANTIVE
        ALLEGATIONS ........................................................................................... 16

        A.     Mobile Telephones and Their RF Front End and RF Filter
               Components ................................................................................ 16

        B.     Trends Affecting RF Front Ends and RF Filters ................ 19

        C.     Resonant's Genesis, Technology, Strategy and Products .................. 20

               1.     Resonant's Genesis .................................................... 20

               2.     Resonant's Technology .............................................. 23

               3.     Resonant's Strategy ................................................... 23

        D.     Resonant's Development Contract with Skyworks ............................. 26

        E.     Skyworks, the Developmehnt Agreement, and the Skyworks
               Duplexer were Highly Material for Resonant and Resonant
               Investors ..................................................................................... 32

VI.     SUBSTANTIVE ALLEGATIONS FOR EXCHANGE ACT CLAIMS ..... 38

A.  The Resonant Defendants' Materially Misleading Statements During the Exchange Act Class Period, and Subsequent Corrective Disclosures ........................................................ 38

    1.  The November 6, 2014 Misleading Statements ...................... 39

    2.  The November 12, 2014 Form 10-Q ...................................... 47

    3.  The November 19, 2014 Misleading Statements .................... 47

    4.  The December 19, 2014 Misleading Statements..................... 50

    5.  The January 14, 2015 Misleading Statements.......................... 51

    6.  The Resonant Defendants' February 26, 2015 Partial CorrectiveDisclosure, Admissions and Further Misleading Statements.............................................................. 53

        a.  The Resonant Defendants' February 26, 2015 Partial Corrective Disclosure: the Skyworks Duplexer's Failure to Meet Applicable Specifications ....... 54

        b.  The Resonant Defendants' February 26, 2015 Admissions that They Had Long Known that the Skyworks Duplexer Would Unlikely Be Able to Meet The Very Aggressive Specificaitons And Had Already Delivered a Non-Compliant Design .................... 57

B.  The Resonant Defendants' February 26, 2015 Further Misleading Statements Concerning Skyworks and the Skyworks Duplexer.......................................................... 61

C.  Market Reactionto the February 26, 2015 Disclosures ..................... 66

D.  The April 2, 2015 Corrective Disclosure........................................... 67

E.  The Resonant Defendants' *Scienter* ..................................... 71

F.  Loss Causation .................................................................. 87

ii

G.     Applicability of Presumption of Reliance (Fraud-On-The Market Doctrine ................................................................................ 89

H.     No Safe Harbor ................................................................................ 91

FIRST CLAIM
Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against the Resonant Defendants ...................... 92

SECOND CLAIM
Violation of Section 20(a) of The Exchange Act Against the Individual Defendants .................................................................................. 97

VII.    SUBSTANTIVE ALLEGATIONS FOR SECURITIES ACT CLAIMS ................................................................................................ 99

THIRD CLAIM
Violation of Section 11 of the Securities Act Against the Securities Act Defendants ............................................................................. 113

FOURTH CLAIM
Violation of Section 15 of the Securities Act Against Defendant Lingren ............................................................................................. 114

VIII.  PRAYER FOR RELIEF .......................................................................... 115

JURY TRIAL DEMANDED .............................................................................. 116

Co-Lead Plaintiffs William E. Haskins and Brent Kaneshiro ("Lead Plaintiffs"), and Plaintiff Onie Bolduc ("Bolduc" and, collectively with Lead Plaintiffs, "Plaintiffs"), by and through undersigned counsel, allege the following upon information and belief, except as to those allegations concerning Plaintiffs, which are alleged upon personal knowledge. Plaintiffs' information and belief is based upon, among other things, the investigation made by and through Plaintiffs' attorneys, which includes without limitation: (a) review and analysis of regulatory filings made by Resonant Inc. ("Resonant" or the "Company"), with the United States Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by Resonant; and (c) review of other publicly available information concerning Resonant.

## I.   NATURE OF THE ACTION AND OVERVIEW

1.   This is a class action on behalf of all persons or entities who purchased or acquired shares of Resonant common stock on the open market between November 6, 2014 and April 2, 2015 inclusive (the "Exchange Act Class Period") and all persons or entities who purchased or acquired Resonant shares in or traceable to Resonant's May 28, 2014 initial public offering of common stock (the "Securities Act Class Period").

2.   The action charges Resonant and certain of its officers and/or directors (collectively and as further specified herein, Defendants) with violations of Sections

11 and 15 of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. §§ 77k and 77o, and Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a), and of Rule 10b-5, 17 C.F.R. §240.10b-5, promulgated thereunder.

3.     Resonant, as further described herein, employs proprietary methods to develop new designs for crucial mobile telephone components known as RF Filters.

4.     At all times from 2012, when Resonant's predecessor was first formed, to March 9, 2015, Resonant had only one single customer, Skyworks Solutions, Inc. ("Skyworks"), for whom Resonant was developing a single RF Filter product (the "Skyworks Duplexer") pursuant to a development agreement between Resonant and Skyworks, as amended and restated on or about May 8, 2013 (the "Development Agreement").

5.     The Development Agreement set forth four different "Milestones" through which Resonant and Skyworks would progress towards development and completion of a product compliant with specifications agreed upon in and/or pursuant to the Development Agreement.   The fourth and last development Milestone required Resonant to deliver a Skyworks Duplexer to Skyworks that was "fully compliant" with Skyworks' specifications.   After Skyworks verified such

compliance, Skyworks could choose to license the Skyworks Duplexer design from Resonant, and Resonant could begin to generate revenue.[1]

6.    The Development Agreement required that Resonant build on its intermediate accomplishments and remain in continual contact with Skyworks while working towards a final development target, *i.e.*, Milestone 4.  As set forth in the attached Declaration of Dr. Joshua W. Phinney, Ph.D. (MIT), P.E. ("Phinney Decl.") and incorporated by reference, milestone-based development agreements, such as the Skyworks Development Agreement, are frequently employed in connection with technology development projects.  *See* Phinney Decl. ¶3.  Under such arrangements, developers typically receive final specifications far in advance of the final design milestone.  *Id.* at ¶9, 15-16.  As such, Resonant plausibly had received the final design specifications by the completion of Milestone 2 and far in advance of commencing work on Milestones 3 and 4.  In fact, in the prospectus for its IPO Resonant disclosed that "Skyworks has developed a set of proprietary specifications for our duplexes based on the demands of its customers."  These specifications *were not* publicly disclosed, so investors relied on the Resonant Defendants to provide accurate and timely progress reports.

---

[1] Following the successful completion of Milestone 4, Resonant's design would "compete with other products for inclusion into a high volume product" as part of Milestone 5.

7.     To be clear, this case is not premised on any "promise" by Defendants to investors that Resonant would deliver a fully-compliant duplexer to Skyworks at the appropriate time, or on any contemporaneous knowledge by Defendants that compliance with Skyworks' specifications was "impossible" (although evidence obtained subsequently may very well prove this to be the case).  Rather, Defendants misled the investing public by touting their achievements of Milestones 2 and 3, and even expressing "a high level of confidence" in their ability to meet Milestone 4, which Defendants characterized as a mere "tun[e] up" and a "test we already have the answers to," while omitting to disclose that they had not been able to meet Skyworks' specifications to that point, and that they considered those specifications to be "very aggressive" to the point that Defendants, who touted their years of experience in the industry, had seen "nothing in the public literature" that met the specifications.  Indeed, it is more likely than not that by November 6, 2014, Resonant's management team knew that it was highly unlikely that they would meet the specifications set forth in the Development Agreement for Milestone 4.  The market reaction when Defendants first disclosed the foregoing on February 26, 2015, confirms the materiality of this information.

8.     Resonant's viability as an ongoing concern was materially dependent upon success with respect to the Skyworks Duplexer.  Resonant had no other customers or products from which it intended to generate revenue prior to exhausting

all of its available funds.  The small tight-knit Resonant team (the Company only had around 25 employees at the time), led by a team of seasoned industry veterans, made delivering a compliant duplexer designer to Skyworks its "primary focus".

9.      Along the way, the Resonant Defendants consistently broadcast to investors the Company's progress in meeting each successive design milestone and its optimism towards ultimately meeting Milestone 4.  During the Class Periods, as detailed herein, Defendants made multiple representations concerning Resonant's purported progress and prospects with respect to the Skyworks Duplexer.  Defendants' positive statements, as detailed herein, caused the market price of Resonant shares to become artificially inflated:  Resonant shares more than tripled in value between May 2014 and February 2015.

10.      On November 6, 2014, Resonant announced that the Company had met Milestone 3 of the Skyworks Development Agreement.  The Resonant Defendants explained publicly that now that Milestone 3 was achieved, Milestone 4 (and the promise of future revenues) was in striking distance.  Milestone 4 was the first point in the process in which Resonant was required to deliver a duplexer that was fully compliant with Skyworks' specifications.  Moreover, the development agreement between Resonant and Skyworks gave Skyworks the unilateral right to terminate the agreement in the event that Resonant delivered a duplexer that did not meet all of Skyworks' specifications.

11.     Between November 6, 2014 and February 26, 2015, Resonant misled investors by conveying a false optimism that the Company could deliver a fully compliant design to Skyworks that would subsequently be selected for commercialization.  The Resonant Defendants suggested*, inter alia*, that only "tuning up" the existing Milestone 3 design was necessary to achieve Milestone 4, expressed "a high level of confidence" in its ability to achieve this goal and even suggested that Milestone 4 was a "test we already have the answers to." Contemporaneously, however, the Resonant Defendants internally confronted the increasing likelihood that the Company would not be able to meet Skyworks' specifications, which Resonant personnel internally believed to be "very aggressive" and which "nothing in the public literature" indicated had been previously met.  As such, the Resonant Defendants privately pinned their hopes on submitting a "competitive" albeit non-compliant as opposed to a "compliant" design to Skyworks.  Thus, at the same time, Resonant, through its continued design work and daily communications with Skyworks, was aware that meeting the "very aggressive" specifications of Milestone 4, which had not been met by anything defendants had seen in the public literature, was highly unlikely.  At minimum, the Resonant Defendants were aware that they *did not* have all the answers to Skyworks' "test" (though the Resonant Defendants acknowledge having all the questions in advance).

12.     On February 26, 2015, Resonant shocked the market when it admitted that it had delivered a non-compliant design to Skyworks, and that Skyworks had rejected Resonant's design.  In an attempt to put a positive spin on this development, Defendant Lingren explained to investors that Skyworks' specifications were "very aggressive" specifications that "nothing in the public literature" suggested had ever been met.  Lingren tried to reassure investors that Resonant remained optimistic because, despite the failure to satisfy Skyworks' "very aggressive" specifications that were unsupported in the public literature, Resonant had delivered a competitive design to Skyworks.

13.     Defendants' February 26, 2015 corrective disclosures led the market to an immediate and severe revaluation of Resonant, whose shares, in the following day's trading (at extremely high trading volume – 14 times greater than average) lost 32.8% of their value, falling $5.07 per share from their February 26, 2015 closing price of $15.47 per share to close on February 27, 2015 at $10.40 per share.

14.     However, notwithstanding such disclosures and declines, Resonant's share price continued to be artificially inflated after February 26, 2015 as a result of Defendants' *further* misleading statements on February 26, 2015 insisting that matters concerning Skyworks and the Skyworks Duplexer were "very positive" and left Resonant "exactly where we wanted to be."

15.     On April 2, 2015, Resonant announced that Skyworks had terminated the Development Agreement after Resonant failed to remedy its prior failings.  Upon learning this news, one analyst expressed his frustration by noting, "The impression that was created . . . [that] Milestone IV to a degree was almost a formality . . . . And you knew that Milestone IV was not met and for a month you said nothing to us.  . . . . I don't feel like we were handled properly."  The sense of betrayal was justified.

16.     Defendants' April 2, 2015 disclosures – putting the lie to Defendants' February 26, 2015 misleading statements, and constituting a further materialization of the information and risks previously concealed and/or omitted by Defendants – led the market to a further, immediate and severe revaluation of Resonant's worth. On the following trading day (April 6, 2015), Resonant shares lost 40.3% of their remaining, already-diminished value, falling $2.98 per share from their April 2, 2015 closing price of $7.39 to close on April 6, 2015 at $4.41 per share.

17.     Consequently, and as a result of Defendants' wrongful acts, Plaintiffs and other Class members have suffered significant damages.

## II.     JURISDICTION AND VENUE

18.     The claims asserted herein arise under Sections 11 and 15 of the Securities Act, 15 U.S.C. §§ 77k and 77o, and Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.

19.   This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, Section 22 of the Securities Act, 15 U.S.C. § 77v, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

20.   Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act, 15 U.S.C. § 78aa(c).   Substantial acts in furtherance of the alleged violations or the effects of the violations have occurred in this Judicial District.  Resonant's principal executive offices are located within this Judicial District, and many of the acts charged herein, including Defendants' preparation and dissemination of materially misleading information, occurred in substantial part in this Judicial District.

21.   In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## III.   PARTIES

### A.   Plaintiffs

22.   Co-Lead Plaintiff William E. Haskins purchased Resonant stock during the Class Periods (as reflected in his sworn certification previously filed with the Court, which is incorporated herein by reference), including shares traceable to Resonant's IPO, and was damaged thereby.

23.     Co-Lead Plaintiff Brent Kaneshiro purchased Resonant stock during the Class Periods (as reflected in his sworn certification previously filed with the Court, which is incorporated herein by reference), including shares traceable to Resonant's IPO, and was damaged thereby.

24.     Co-Lead Plaintiffs William E. Haskins and Brent Kaneshiro are referred to hereinafter as "Lead Plaintiffs."

25.     Plaintiff Onie Bolduc ("Bolduc") purchased Resonant stock during the Class Periods, including shares traceable to Resonant's IPO, and was damaged thereby (as reflected in his sworn certification previously filed with the Court, which is incorporated herein by reference).

**B.     Defendants**

26.     Defendant Resonant is a Delaware corporation with its principal executive offices located at 110 Castilian Drive, Suite 100, Goleta, California 93117.

27.     Defendant Terry Lingren ("Lingren") was, at all relevant times, Chief Executive Officer ("CEO") of Resonant and Chairman of Resonant's Board of Directors.  Lingren signed the Registration Statement for Resonant's IPO.

28.     Defendant John Philpott ("Philpott") was, at all relevant times, Chief Financial Officer of Resonant.

29.     Defendant MDB Capital Group, LLC ("MDB") is a limited liability corporation organized under California law with its principal place of business

located at 401 Wilshire Boulevard, Suite 1020, Santa Monica, CA 90401.  MDB served as underwriter of Resonant's IPO.

30.     Defendants Resonant, Lingren and Philpott are at times collectively referred to hereinafter as the "Resonant Defendants."

31.     Defendants Lingren and Philpott are at times collectively referred to hereinafter as the "Individual Defendants."

32.     Defendants Resonant, Lingren and MDB are at times collectively referred to hereinafter as the "Securities Act Defendants."

## C.     Relevant Non-Parties

33.     Skyworks Solutions, Inc. ("Skyworks") is a Delaware corporation with its principal executive offices located at 20 Sylvan Road, Woburn, Massachusetts 01801.   Skyworks designs and manufactures analog semiconductors used in smartphones and other similarly "connected" devices in the automotive, broadband, energy, industrial, medical, military and telecommunications industries.

34.     In particular, Skyworks is one of the world's leading manufacturers of RF Front End components (including power amplifiers, switches, and filters), as well as one of the world's leading integrators of RF Front Ends.  As repeatedly explained in Resonant's Class Period conference calls and SEC filings, only 5-10 companies – including, in addition to Skyworks, Avago Technologies, Qorvo, Inc., Murata Manufacturing Co. and Qualcomm Inc. – are responsible for, and control, the

manufacture and supply of such RF Front End products.  *See e.g.*, Defendant Lingren's remarks during his March 10, 2015 presentation at the 27th Annual ROTH Capital Conference ("there are really only seven, six or seven companies that control the entire filter market for mobile devices.  All 21 plus billion filters that shipped last year came out of these six or seven companies."); *see also* Defendant Lingren's remarks during his November 19, 2014 presentation at the Southwest IDEAS conference (identifying four main suppliers for SAW filters, three main suppliers of BAW filters; and three main RF Front End integrators, including Skyworks, which Defendant Lingren identified as "the big player" in the RF Front End integration market).

35.    Skyworks' RF Front End components and modules are used in the world's leading smartphones from Apple (*i.e.*, the iPhone, including the iPhone 6) and Samsung.  Generally explosive smartphone growth, and Skyworks' more particular positioning within the smartphone market as a leading supplier for the most popular and sophisticated smartphones, have caused Skyworks' revenue to soar from $1.07 billion (in fiscal 2010) to $2.29 billion (in fiscal 2014).

## IV.    CLASS ACTION ALLEGATIONS

36.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of the following classes:  (a) a class, consisting of all those who purchased shares of Resonant common stock on the open

market during the period from and including November 6, 2014 through April 2, 2015 (the "Exchange Act Class"); (b) a class consisting of all persons or entities who purchased shares in or traceable to Resonant's May 28, 2014 IPO, and who were damaged thereby (the "Securities Act Class", and together with the Exchange Act Class, "the Classes").  Excluded from the Classes are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

37.    The members of the Classes are so numerous that joinder of all members is impracticable.  While the exact number of members the Classes is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Classes.  3.105 million shares of Resonant common stock were offered and/or sold in Resonant's IPO.  As of November 1, 2014, Resonant had 6.9 million shares of common stock outstanding and throughout the Class Periods, Resonant shares were actively traded on the Nasdaq Stock Market ("NASDAQ"), with average daily trading exceeding 200,000 shares per day.  Record owners and other members of the Classes may be identified from records maintained by Resonant or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

38.     Plaintiffs' claims are typical of the claims of the members of the Classes, as all members of the Classes are similarly affected by Defendants' wrongful conduct, in violation of federal securities laws, complained of herein.

39.     Plaintiffs will fairly and adequately protect the interests of the members of the Classes, and have retained counsel competent and experienced in class and securities litigation.

40.     Common questions of law and fact exist as to all members of the Classes and predominate over any questions solely affecting individual members of the Classes.  Among the questions of law and fact common to the Exchange Act Class are:

a.     whether the federal securities laws were violated by the Resonant Defendants' acts as alleged herein;

b.     whether the Resonant Defendants' public statements during the Exchange Act Class Period were materially misleading, and/or omitted material facts, concerning the Company's efforts *vis-à-vis* Skyworks;

c.     whether the Resonant Defendants acted with *scienter* in making false or misleading statements during the Exchange Act Class Period; and

d.     whether members of the Exchange Act Class have sustained damages and, if so, the proper measure thereof.

41.    Common questions of law and fact exist as to all members of Securities Act Class, and predominate over any questions solely affecting individual members of the subclass.  Among the questions of law and fact common to the subclass are:

a.    whether the Resonant IPO Offering Documents contained materially misleading statements and/or material omissions;

b.    whether the federal securities laws were violated by the Securities Act Defendants' acts as alleged herein;

c.    whether MDB failed to conduct adequate due diligence as underwriter of the Resonant IPO; and

d.    whether Defendant Lingren acted negligently in signing the Registration Statement alleged herein to have been materially misleading and to have omitted material facts.

42.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class Members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Classes to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## V.    FACTUAL BACKGROUND FOR SUBSTANTIVE ALLEGATIONS

### A.    Mobile Telephones and Their RF Front End and RF Filter Components

43.    Mobile communications devices, such as mobile telephones, work by transmitting and receiving digital information encoded as analog radio frequency ("RF") signals between the mobile device and cellular base station.

44.    The RF spectrum is regulated by the Federal Communications Commission ("FCC"), which has set aside certain discontinuous ranges of the spectrum for mobile telephones.  These discrete, discontinuous ranges of the RF spectrum are termed "bands."

45.    Every mobile device has: (1) an antenna, through which RF signals may be accessed or transmitted; (2) a "digital baseband system" (in which all digital processing occurs, and which has grown tremendously in smartphones), including components that effect translation between analog and digital signals; and (3) between the antenna and digital baseband, an analog RF front-end circuitry module (an "RF Front End").

46.    The RF Front End is responsible for the analog signal processing required to transmit and receive RF signals between the mobile device and the cellular base station.  Among the functions performed by the RF Front End are: (1) filtering, in order to select and isolate RF signals of particular frequencies (*i.e.*, signals on particular bands); (2) amplification of low-level signals (for both

transmitted and received signals); and (3) transmitting and receiving those signals to and from the cellular base station via the antenna.

47.    Relevant here is the filtering function, performed by RF filters, which, as described below, have come to constitute ever-larger and costlier portions of RF Front Ends.

48.    RF filters consist of a series of interconnected "resonators" – devices that naturally oscillate or resonate at specific frequencies – whose array is designed to select (or "pass") a discrete, desired radio frequency signal and block all other signals from other frequencies.  In other words, a filter "tunes in" to a particular band in the RF spectrum.

    a.    Surface Acoustic Wave filters ("SAW filters") are a type of filter, in use since the early days of mobile phones, that perform their filtering function via acoustic waves that travel along the surface of a material exhibiting elasticity (and whose amplitude decays exponentially with depth below the material's surface).  While SAW filters are both smaller and less expensive than BAW filters, which make them attractive to mobile device manufacturers and consumers (given, *inter alia*, requirements and expectations to fit a tremendous amount of functionality in a very small handset), they frequently do not provide adequate performance on many of the newer and higher frequency

1   mobile telephone bands, for which BAW filters are often required

2   (termed "hard bands").

3   b.   Bulk Acoustic Wave filters ("BAW filters") are a newer type of filter,

4   that perform their filtering function via acoustic waves that travel

5   *through* a material exhibiting elasticity.   Although BAW filters are

6   more expensive and larger than SAW filters, their presence is often

7

8   necessary in newer mobile telephones and smartphones, which operate

9   on a newer and/or high-frequency hard bands where SAW filters

10

11   experience diminished performance.

12

13   c.   Duplexers are two filters combined into a single component which

14   simultaneously selects both the transmit and the receive signals.

15

16   49.   Current RF filters are, and have long been, variously-optimized

17   versions of a filter design in which resonators are arrayed in what is known as

18   "acoustic wave ladder" topology (first developed by Lloyd Espenschied in 1931).

19   Subsequent to development of the acoustic wave ladder design topology,

20   incremental improvements in filters and filter performance have largely been sought

21   and found through alterations in materials and manufacture (rather than through

22   alternative design topologies).

23

24

25

26

27

28

## B.  Trends Affecting RF Front Ends and RF Filters

50.     The explosive growth in mobile telephone users and usage, including exponential growth in mobile data traffic as smartphones and tablets become a primary means of accessing the internet, have exceeded the capacity, or "bandwidth," of the RF spectrum originally set aside for mobile telecommunications.  To accommodate such growth, regulators have opened new swathes of the spectrum for mobile telephone communications.

51.     As a result, the number of bands on which mobile telephones operate has proliferated.  In turn, as each band requires a discrete filter to allow the telephone to "tune into" it (and block out signals from other portions of the spectrum), the number of filters (or duplexers) that mobile telephones must include has likewise proliferated.  Current smartphone models now include, for example, more than two dozen filters in order to allow them to access the necessary bands.

52.     This has created three related problems for mobile telephone manufacturers – and/or, more specifically, for RF Front End manufacturers.

a.     First and most fundamentally, the necessity to include so many discrete filters has led not only to increased cost and complexity, but also increased size (in a device where space is at a premium), in RF Front Ends.  Filters alone are now nearing 50% of RF Front end cost and size.

b.    Second and simultaneously exacerbating the above problems, many of the newer bands are "hard bands" where traditional SAW filters (*i.e.*, using fixed acoustic wave ladder design topology) have not provided adequate performance, and where larger and more expensive BAW filters must be used instead;

c.    Third, manufacturers are confronted with more complex product lines and supply chains: as the number of filters is too great to all be included in one phone or RF Front End, which could then function as a single product to be supplied to all handset manufacturers and carriers, RF Front End manufacturers must make multiple models (also termed "stock-keeping units," or "SKUs") of RF Front Ends distinguished by the different sets of filters each includes.

**C.    Resonant's Genesis, Technology, Strategy and Products**

**1.    Resonant's Genesis**

53.    Resonant's predecessor, Resonant LLC, was established in 2012 by three co-founders: Robert Hammond, Neal Fenzi and Defendant Lingren.

54.    Messrs. Hammond and Fenzi occupied, at the time, senior technical executive positions in Superconductor Technologies Inc. ("STI"): Mr. Fenzi as STI's Vice President of Engineering and Chief Engineer; and Mr. Hammond as STI's Senior Vice President and Chief Technology Officer. Between 2005 and

2010, STI, among other things, developed an RF filter design technology, which it termed "Reconfigurable Resonance" or "RcR," which it paired with high-temperature superconducting technology in order to produce the world's highest performance RF filters for cellular base stations.  Between 2007 and 2010, STI began a program to use its RcR technology to develop electronically tunable RF SAW filters for mobile devices.  Messrs. Hammond and Fenzi, as well as other STI personnel who also later became Resonant employees, were involved in STI's RF filter operations and in the creation and development of RcR.  However, in 2010, STI determined to focus solely on superconducting wire operations, and ceased further work on RF filters.

55.    Mr. Hammond, wishing to pursue commercialization of STI's languishing RcR technology for mobile telephone handsets (and analogous mobile devices, such as tablets, etc.), recruited Mr. Fenzi and Defendant Lingren to join him in co-founding Resonant LLC.  In exchange for providing STI with a stake in Resonant LLC, STI contributed its RcR technology (in the form of 14 patents held by STI) to Resonant, as well as temporary office space, equipment, and the original version of the Development Agreement with Skyworks.

56.    In 2013, in connection with obtaining further financing through the sale of $7.0 million of senior convertible notes (convertible into 2,087,667 shares of Resonant common stock), Resonant LLC became Resonant Inc., with the co-

founders' interests in Resonant LLC exchanged for shares and warrants of Resonant, and STI's interest in Resonant LCC exchanged for a $2.4 million subordinated convertible note (convertible into 700,000 shares of Resonant stock).

57.    On or about May 28, 2014, Resonant completed an initial public offering of 3.105 million shares of its common stock, with net proceeds to Resonant, after all offering expenses, of $16.2 million.  The IPO was conducted pursuant to a registration statement on Form S-1, filed by Defendants with the SEC on or about January 24, 2014, an amended registration statement dated March 24, 2014, an amended registration statement dated April 11, 2014, an amended registration statement dated May 16, 2014, an amended registration statement dated May 21, 2014, an amended registration statement dated May 27, 2014 (collectively, the "Registration Statement"), and a Prospectus dated May 28, 2014 (the "Prospectus") (the Registration Statement together with the Prospectus, the "Offering Documents").

58.    As represented in the IPO Offering Documents (and reiterated throughout the Class Periods), proceeds from the IPO would suffice to fund Resonant's operations for the following two years (*i.e.*, through early/mid-2016) even if Resonant generated no revenues during such period.  *See e.g.*, Prospectus at 10, 52; *see also* Resonant's November 2014 10-Q (filed with the SEC on November

12, 2014) at 24, and Form 10-K for 2014, filed with the SEC on March 27, 2015 (the "2014 Form 10-K") at 14.

## 2.      Resonant's Technology

59.      Resonant has renamed the RcR technology acquired from STI so that it is now termed "Infinite Synthesized Networks" (or "ISN").

60.      ISN, among other things, is a system or set of methods for: (1) creating, analyzing and evaluating large sets of alternative, potentially viable circuit structures in light of a given set of specifications or parameters, and (2) identifying the best structural solution, after analyzing various trade-offs in performance, cost and size, for any given design problem.

61.      Applying ISN to RF filter design has allowed Resonant to break away from the default design topology for filters (*i.e.*, acoustic wave ladder), to explore (infinite) *alternative* filter designs and topologies, and to discover and identify instances where such alternative designs may either outperform or provide competitive/comparable performance at reduced cost.

## 3.      Resonant's Strategy

62.      Resonant seeks to employ its ISN technology to RF filter design in order to respond to the above-discussed trends in the mobile telephone industry as they affect RF Front Ends.  In particular, Resonant purports to focus on developing

two products that would provide discrete solutions to the cost, size and complexity problems facing RF Front End manufacturers and integrators.

63.    The first prong of Resonant's strategy was to focus on "single band designs" – *i.e.*, filters built to tune into a single, specific frequency band.  Here, Resonant's objective was to use its ISN technology to design a series of SAW filters that perform well on the "hard bands" that are presently limited (given current dependence on acoustic wave ladder filter design) to larger and more expensive BAW filters.  Resonant's SAW filters, to the extent they were able to perform as well or better than standard-design BAW filters, would create RF Front End savings with respect to both costs (SAW filters costing 50% less than BAW filters) and space (SAW filters being smaller than BAW filters).

64.    The product that Resonant was developing for Skyworks under the Development Agreement, which related to Band 3 (one of the most heavily used "hard bands") was the first of this intended series of single-band products.

65.    The second prong of Resonant's strategy was to develop "tunable designs" – *i.e.*, to develop a filter that was *not* limited, like all extant filters, to a single band, but instead one that could tune into multiple bands (*e.g.*, 2 bands, 3 bands, or more) as needed and in real time, through electronic programming.  Such tunable filters, considered the "holy grail" of the RF Front End industry, would solve many of its above-detailed cost, space and complexity issues.  One tunable filter

could replace many of the multiple, separate, single-band filters currently included in many mobile devices' RF Front Ends, and thereby simultaneously: (1) substantially reduce overall RF filter and RF Front End cost; (2) substantially reduce RF Front End size (by virtue of having just one tunable filter rather than dozens of single-band filters); and (3) substantially reduce manufacturers' logistical complexities, by allowing them to produce one phone with one filter (rather than multiple versions of otherwise similar phones packed with different constellations of filters for different mobile carriers).

66.     In both cases – single-band and tunable – Resonant's strategy, rather than manufacture actual RF filters whose designs it had developed, was instead to license its designs to companies that make a part of RF Front Ends (*e.g*., filters, power amplifiers, RF switches) or to companies that manufacture or integrate entire RF Front Ends (such as Skyworks).   Resonant's designs would provide such companies with attractive products *and* cost savings (*e.g*., an RF Front End using a smaller and cheaper SAW filter that provided BAW-like performance on a hard band, rather than using a larger and more expensive BAW filter), and thus allow such companies to increase sales and market share.   Resonant would extract its share of such benefits through license fees for the designs that produced such benefits – in the form of fixed sums for each unit sold that incorporated Resonant designs.

**D.   Resonant's Development Contract with Skyworks**

67.   Prior to Resonant's existence, STI negotiated – and, on or about February 3, 2012, signed – an original version of the Development Agreement with Skyworks.  Subsequently, on or about July 6, 2012, after Resonant LLC was formed, STI took an ownership stake in Resonant LLC in exchange for providing Resonant LLC with, *inter alia*, its RcR technology and the original version of the Development Agreement with Skyworks.  Skyworks consented to the transfer in a June 3, 2012 letter.

68.   On or about May 8, 2013 – and shortly before its June 2013 financing through the sale of $7.0 million of senior convertible notes – Resonant and Skyworks agreed to and signed an Amended and Restated Development Agreement (the "Development Agreement").

69.   Defendant Lingren signed the Development agreement on behalf of Resonant.

70.   The Development Agreement called for Resonant to develop, for Skyworks, a design for a single-band SAW duplexer for Band 3 (one of the most heavily used hard bands, which required larger and more expensive BAW filters for adequate performance).  As further set forth below, and as Defendants explained in Resonant's SEC filings, Resonant's SAW duplexer design was required to meet "a

set of proprietary specifications" developed by Skyworks "based on the demands of its customers." Prospectus, at 36.

71.     According the Development Agreement, design work was supposed to progress through four milestones (each a "Milestone"). Technology development agreements are often structured to include key "milestone" events. *See* Phinney Decl. ¶¶9, 15-16. However, in order to ensure that intermediate engineering decisions do not preclude future progress, developers typically require full design specifications far in advance of reaching subsequent milestones. *Id.* This approach is consistent with the four development Milestones that were summarized in Resonant's SEC filings (as reproduced immediately below):

**The Development Agreement's Four Milestones**

| Milestone | Deliverable | Details |
|---|---|---|
| Milestone 1 | Resonator Designs | Design a set of resonators, fabricate using an approved high volume manufacture and provide test results |
| Milestone 2 | 1st Duplexer Design | Design the first iteration of a fully-packaged duplexer, fabricate using the approved manufacturer, provide test results and deliver samples |

CONSOLIDATED SECOND AMENDED CLASS ACTION COMPLAINT

27

| | | |
|---|---|---|
| Milestone 3 | 2nd Duplexer Design | Design the second iteration of a fully-packaged duplexer, fabricate using the approved manufacturer, provide test results and deliver samples |
| Milestone 4 | Production-Ready Duplexer Design | Design production-ready, fully-packaged duplexer, fabricate using the approved manufacturer, provide test results and deliver samples |

72.    The Development Agreement's four Milestones were set forth in greater detail in the Development Agreement at Exhibit A (the Development Agreement's "Statement of Work" or "SOW"), which, among other things, provided greater detail on the specific roles, tasks, obligations and requirements of both Resonant and Skyworks at each Milestone.

73.    With respect to *specifications*, the Development Agreement:

a.    set forth certain specifications at Exhibit C thereto;[2]

---

[2]    However, in the publicly-available version of the Development Agreement included as Exhibit 10.35 to Resonant's January 24, 2014 Registration Statement, any and all particular specifications contained in Development Agreement were redacted – with un-redacted information filed separately, privately and confidentially with the SEC.

b.      pursuant to Section 2(a) of the Development Agreement, allowed Resonant and Skyworks to "mutually agree" to updated specifications (*e.g.* "adjustments to specifications and/or acceptance criteria [] in connection with [each] Milestone");

c.      pursuant to Section 3 of the Development Agreement, established a 30-day "Test Period," following Resonant's completion of each Milestone, for Skyworks to evaluate whether the milestone had in fact been met;

d.       pursuant to the same Section 3, allowed Skyworks, in the event that it determined that the Milestone or finished product did not in fact conform to the Development Agreement's "specifications, success criteria or requirements," to label any such failures as a "Defect," and to notify Resonant of any such Defects;

e.      pursuant to the same Section 3, thereafter allowed Resonant an additional 30 days to endeavor correct or cure any and all such Defects; and

f.      pursuant to the same Section 3, provided that in the event Resonant was unable to correct or cure all Defects in such 30 days, *Skyworks' sole remedy and recourse for such failure and Defect shall be to terminate this Agreement* by delivering written notice to Resonant… or to waive the failure in writing and proceed with the Development….

CONSOLIDATED SECOND AMENDED CLASS ACTION COMPLAINT
29

[Italics added for emphasis]

74. Pursuant to the Development Agreement, Resonant was required to remain in close contact with Skyworks to ensure consistent progress.  In addition, according to industry custom, Resonant plausibly had received the Skyworks specifications by the completion of Milestone 2.  Likewise, the Development Agreement made clear that Skyworks would become increasingly involved in evaluating Resonant's progress after Resonant moved past the first 2 development milestones.  For example, the Development Agreement states that as part of Milestone 3 Resonant first would be required to design and test sample duplexers. Skyworks then would receive and "perform preliminary qualification tests (including ruggedness testing) on packaged Duplexers."  Thus, Resonant was liekly aware of any perceived design shortcomings or of any other of Skyworks' concerns before and during the Milestone 3 qualification process.

75. Additionally, and particularly with respect to specifications at Milestone 4, the Development Agreement repeatedly made explicit that at Milestone 4, Resonant's product was expected to be "fully compliant" with specifications.

a. For example, Exhibit A to the Development Agreement required Resonant to deliver to Skyworks a "Spec compliant packaged duplexer" (which Skyworks would them run through a gamut of tests,

including "Full electrical testing of duplexer (environment, linearity, etc.)" as well as "qualification tests as needed to qualify the design."

    b.    Likewise, Exhibit A to the Development Agreement stated:  "*At this milestone the duplexer performance is expected to be compliant*."

[Italics added for emphasis]

    c.    Similarly, Exhibit B, with respect to Milestone 4, stated that Resonant was obligated to "sample filter fully compliant."

    d.    In instructive contrast, Exhibit B stated with respect to Milestone 3 that "Resonant to sample filter with an agreed upon level of performance. *Need not be fully compliant* but must be good enough that the device can be used in a module and run through selected prequalification testing." (emphasis added).

    76.    By the time of Resonant's May 2014 IPO, Resonant had progressed through Milestones 1 and 2 of the Development Agreement and, as stated by Resonant in the Prospectus, was "actively working on Milestone 3."  Resonant represented that it expected to complete Milestone 4, in which it was expected and required to deliver a product fully compliant with specifications, towards the end of 2014.

77.     Under the Development Agreement, Resonant's failure to deliver a specification-compliant product at Milestone 4 would allow Skyworks to declare the product defective and terminate the Development Agreement.

### E.     Skyworks, the Development Agreement, and the Skyworks Duplexer were Highly Material for Resonant and Resonant Investors

78.     Resonant's operations relating to Skyworks, the Skyworks Duplexer and the Development Agreement were not merely material, but *vital*, to Resonant and Resonant investors.

79.     As Defendants repeatedly explained in Resonant's SEC filings (as well as in conference calls with Resonant analysts and investors):

a.     In Resonant's May 2014 IPO, Resonant gained net proceeds of approximately $16.2 million.

b.     These proceeds would suffice to fund Resonant's operations for approximately two years – *i.e.*, until early/mid-2016 – even in the absence of any revenues.

c.     However, given the length of time required for product development, and the further length of time between having a product accepted by a customer and beginning to see revenue flow from such product, Resonant's *only* prospect for generating revenue before running out of IPO funds was the Skyworks Duplexer.

d.    Consequently, if Resonant failed to win orders for the Skyworks Duplexer, its very viability as a going concern would be threatened, and, to avoid collapse and/or bankruptcy, Resonant would have to secure further financing.

e.    However, there was no guarantee that additional financing could be obtained if needed, and even if such additional financing was obtained when needed, its very provision could have a material adverse effect on Resonant shareholders (for example, by diluting their ownership stake in Resonant).

f.    Consequently, if Resonant failed to generate revenue from Skyworks through success with the Skyworks Duplexer, it faced either (a) running out of funds and collapse, or (b) raising necessary further funds through a potentially punitive refinancing that could substantially dilute Resonant's extant shareholders.

80.    For example, *see*:

a.    Resonant's Form 10-Q, filed with the SEC on November 12, 2014 (the "November 2014 10-Q"), at 8 and 24:

We recently completed an initial public offering to raise additional capital.  There is no assurance that the proceeds will be sufficient to provide us with adequate resources to fund future operations, and we may need additional financing to continue with our plan of commercialization and for general working capital.  Further, *if we are unable to complete the duplexer design under the development agreement or Skyworks declines to license the design, we*

CONSOLIDATED SECOND AMENDED CLASS ACTION COMPLAINT
33

1

*will require additional financing. No assurance can be
given that any form of additional financing can be
obtained, that the terms of such financing will be
acceptable or that such financing would not be dilutive to
existing shareholders.*

2

3

4

5

\*\*\*

6

7

We believe our cash resources will provide sufficient
funding for planned operations into 2016, even without
revenues. We may need additional financing to continue
with our plan of commercialization and for general
working capital. *Further, if we are unable to complete the
duplexer design under the development agreement or
Skyworks declines to license the design, we will require
additional financing. No assurance can be given that any
form of additional financing can be obtained, that the
terms of such financing will be acceptable or that such
financing would not be dilutive to existing shareholders.*

8

9

10

11

12

13

14

[Italics added for emphasis]

15

  b.  Resonant's Prospectus, at 10-11:

16

17

. . . We are offering shares of common stock in an initial
public offering to raise additional capital. There is no
assurance that the proceeds will be sufficient to provide us
with adequate resources to fund future operations, and we
may need additional financing to continue with our plan of
commercialization and for general working capital.
Further, *if we are unable to complete the duplexer design
under the development agreement or Skyworks declines to
license the design, we will require additional financing.
No assurance can be given that any form of additional
financing can be obtained, that the terms of such financing
will be acceptable or that such financing would not be
dilutive to existing shareholders.*

18

19

20

21

22

23

24

25

26

\*\*\*

27

28

**We may not be able to complete a design that meets our potential customer's specifications.  Even if we succeed in developing a design that meets all the specifications in our development agreement, our potential customer could decline to use our design in its product.  Further, our customer's product could fail in the marketplace.  Any of these events would have a material adverse effect on our business and potentially threaten our viability**.

The development agreement with our one potential customer requires us to meet stringent performance specifications and compete against other technologies for inclusion into the potential customer's product.   Our potential customer's final product will then compete against other products and technologies for inclusion into mobile devices in the marketplace.   There can be no assurance that we can complete our design or that our final design will have acceptable performance and meet all specifications in our development agreement.   The decision to use our design is solely within our potential customer's discretion.   Even if our design meets all the specifications in our development agreement, our potential customer could decline to use our design in its product.  Further, if selected for inclusion in its product by our potential customer, there is no guarantee that its final product will win out over its competition for inclusion into mobile devices.  *Either failure (to be selected at the design stage or the device stage) would have a material adverse effect on our business and potentially threaten our viability*.

[Bold in original; italics added for emphasis]

c.     Resonant's 2014 Form 10-K, at 14:

.  .  . We believe our current resources will provide sufficient funding for planned operations into the first half of 2016.  *If we do not generate adequate cash from revenues in 2016 in order to reach positive cash flows, we*

CONSOLIDATED SECOND AMENDED CLASS ACTION COMPLAINT
35

*likely will be required to obtain additional financing to continue with our plan of commercialization and we might be forced to make substantial reductions in our operating expenses, which could adversely affect our ability to implement our business plan and ultimately our viability as a company.*  No assurance can be given that any form of additional financing can be obtained, that the terms of such financing will be acceptable or that such financing would not be dilutive to existing stockholders. . .

\*\*\*

**We may not be able to complete a design that meets our first customer's specifications.  Even if we succeed in developing a design that meets all the specifications for our customer, the customer could decline to use our design in its product.  Further, our customer's product could fail in the marketplace.** ***Any of these events would have a material adverse effect on our business and potentially threaten our viability***.

We are currently working on a filter design for our first customer, and the customer has given us stringent performance specifications. We will also compete against other technologies for inclusion into the customer's product. Our customer's final product will then compete against other products and technologies for inclusion into mobile devices in the marketplace. There can be no assurance that we can complete our design or that our final design will have acceptable performance and meet our customer's specifications. The decision to use our design is solely within our customer's discretion.

We have delivered a completed duplexer design for consideration to our first customer. Our design does not meet all the specifications in the development agreement, however, we believe our design delivers competitive performance and is competing with other products. The customer is evaluating it, and there is no assurance that our design has acceptable performance and therefore will be used.

CONSOLIDATED SECOND AMENDED CLASS ACTION COMPLAINT
36

1
2
3
4
5

> Even if it has acceptable performance, there are a number of other considerations influencing the customer's decision whether to use our design, many of which are beyond our control. Further, if selected for inclusion in its product by our customer, there is no guarantee that its final product will win out over its competition for inclusion into mobile devices. *Either failure (to be selected at the design stage or the device stage) would have a material adverse effect on our business and potentially threaten our viability.*

6
7

[Bold in original; italics added for emphasis]

8
9
10

      81.    As Defendants' above-specified statements indicated, failure on the Skyworks project meant that Resonant shares might lose much or all of their value,

11
12
13

as Resonant would either: (1) collapse, in the event that it could not obtain further funding on acceptable terms (and, absent the revenue that only Skyworks could

14
15
16

provide in time, run out of funds); or (2) continue, in the event that new funding could be obtained, but at the possible cost of diluting the stakes of extant Resonant

17
18

investors. *Id*. Securing revenue flow from Skyworks was Resonant's best, and

19
20

likely *only*, way to avoid either Resonant's overall collapse (in the event refinancing could not obtained following failure with Skyworks), or collapse in the value of

21
22
23

extant shareholder's stakes in Resonant (in the event refinancing could be obtained following failure with Skyworks).

24
25
26

      82.    Therefore, the Skyworks Duplexer, Skyworks' specifications for such product, and Resonant's ability to meet such specifications, were all highly material

27
28

matters to Resonant and Resonant investors, including Plaintiffs and members of the Classes.

83.     The market's severe revaluation of Resonant's worth, following Resonant's February 26 and April 2, 2015 corrective disclosures concerning these matters, provides concrete, objective and real-world indication of such materiality.

## VI.   SUBSTANTIVE ALLEGATIONS FOR EXCHANGE ACT CLAIMS

### A.   The Resonant Defendants' Materially Misleading Statements During the Exchange Act Class Period, and Subsequent Corrective Disclosures

84.     During the Exchange Act Class Period and as detailed below, the Resonant Defendants made numerous positive representations concerning Resonant's purported progress on the Skyworks Duplexer and under the Development Agreement, while knowing, but omitting to disclose:

a.      the specifications for the Skyworks Duplexer, as set forth in and/or pursuant to the Development Agreement;

b.      the degree of difficulty involved in progressing from Milestone 3 to a fully compliant Milestone 4 design;

c.      the fact that Resonant had not been able, to that point, to come up with a design that satisfied all of Skyworks' specifications;

d.      that defendants believed Skyworks' specifications to be "very aggressive" specifications, which "nothing in the public literature" suggested had previously been met;

e.     that, consequently, Resonant likely would not be able to satisfy Milestone 4 of the Development Agreement (which required Resonant to provide a product fully compliant with the applicable specifications);

f.     that, consequently, Skyworks' ability to unilaterally terminate the Development Agreement was not a remote or contingent risk, but a very likely, if not imminent risk.

85.     The Resonant Defendants' private awareness of such undisclosed, adverse and material facts concerning Skyworks, the Skyworks Duplexer and the Development Agreement rendered the Resonant Defendants' public statements during the Exchange Act Class Period concerning these matters, detailed below, materially misleading.

### 1.     The November 6, 2014 Misleading Statements

86.     On November 6, 2014, after the market closed, Resonant:  (1) issued a press release entitled, "Resonant Inc. Reports 2014 Third Quarter Financial Results and Provides Business Update;" (2) filed a Form 8-K with the SEC, attaching the November 6, 2014 press release as an exhibit thereto; and (3) held a conference call with analysts and investors, beginning at 5:00 p.m. Eastern Standard Time, to further discuss its operations and results of operations, and to answer questions from analysts and investors concerning the same.

87.     The Resonant Defendants' November 6, 2014 press release (and Form 8-K) made a number of representations concerning Resonant's work on the Skyworks Duplexer, including

a.      that Resonant had completed the Development Agreement's third Milestone;

b.      that Skyworks had certified that Resonant had indeed satisfactorily completed its obligations relating to the third Milestone;

c.      that Resonant was beginning work on the fourth and final Milestone;

d.      that Resonant would complete such work by the first quarter of 2015; and

e.      that the Milestone 3 version of the Skyworks Duplexer already provided "competitive performance" while confirming Resonant's "value proposition" (*i.e.*, by using cheaper SAW filters rather than more expensive BAW filters).

88.     Specifically, the November 6, 2014 press release stated, in relevant part:

**Highlights and Business Update**:

*Completed Milestone 3 and commenced work on the 4th and final Milestone* for the Company's first single-band design, which is being developed in collaboration with a major customer.

* * *

Chief Executive Officer, Co-Founder and Chairman Terry Lingren, stated, "We are pleased to report that *we completed Milestone 3 to our customer's satisfaction on our first development agreement. The duplexer we produced to meet this milestone exhibits competitive performance* and represents a significant accomplishment for our engineering team. *We now expect to complete Milestone 4 in the first quarter of 2015.*

"*We remain confident in our ability to deliver this duplexer design* for a high volume band *and demonstrate our value proposition* to suppliers of RF front-ends for mobile devices. The improvement in our models and design tools on this initial design will also benefit all future projects by reducing the development time through efficiency gains," said Mr. Lingren.

[Italics added for emphasis]

89.    The Resonant Defendants' above-detailed statements in the November 6, 2014 press release were materially misleading and/or omitted to state material facts requisite to render them not misleading, for failure to disclose the information referenced in ¶84, *supra*, as well as for the following reasons:

a.    The Resonant Defendants' representations concerning completing Milestone 3 (to Skyworks' satisfaction), commencing work on Milestone 4 and expecting to complete work on Milestone 4 during the first quarter of 2015 were all materially misleading in light of the omitted fact that the Resonant Defendants knew that they had to that point not been able complete Milestone 4 to Skyworks's specifications;

b.    that Resonant believed the specifications "very aggressive", and in Defendants' years of experience in the field they had not seen anything

in the public literature that met the specifications that Resonant was

contractually obligated to meet in connection with Milestone 4;

c.      the Resonant Defendants' representations that they were "confident in

our ability to deliver this duplexer design" were materially misleading

in light of the omitted facts set forth in(a) and (b) above;

d.      the Resonant Defendants' representations concerning the "competitive

performance" displayed by the Milestone 3 version of the Skyworks

Duplexer were materially misleading in light of the omitted fact that the

Resonant Defendants knew the final, Milestone 4 version of the

Skyworks Duplexer would have to meet Skyworks' requisite

performance specifications, which, for the reasons set forth in (a) and

(b) above, Defendants knew to be extremely challenging, if not highly

unlikely.

90.     During the initial "listen-only" portion of the November 6, 2014 conference call with analysts and investors, Defendant Lingren made further statements concerning Resonant's work on the Skyworks Duplexer, including:

a.      First, I am pleased to announce that on our first project we have

passed the third contractual milestones to the satisfaction of our

customer and we've commenced work on our fourth and final

milestone.  We believe we are now beyond the steepest part of the S-8 development curve.

b.      We're targeting the first quarter of 2015 for design completion. Design completion is the new term which we define as agreement with our customer that the final design meets competitive performance for a production-ready, full package duplexer.  It is synonymous with Milestone 4.

c.      One, after design completion our customer has the right to license our design and therefore accept the product.  Two, upon design completion the customer takes the design into a process we're defining as product insertion.  This is another new term and entails activities such as completion of the qualification testing, module integration and ramp up of production leading to initial customers sales.  We expect this will take approximately six months beyond design completion.

d.      This project has been a tremendous collaboration and we're extremely pleased and grateful for the good working relationship we have with our first customer.  We'll continue to work diligently to meet the remaining terms our first project and look forward to reporting to you on its successful outcome.  We're in ongoing discussions about

CONSOLIDATED SECOND AMENDED CLASS ACTION COMPLAINT

43

additional projects with this customer and we'll report our progress as significant events unfold within the limits of our confidentiality obligations.

91.    Resonant held the Resonant Defendants' above-detailed statements in initial listen-only portion of Resonant's November 6, 2014 conference call were materially misleading and/or omitted to state material facts requisite to render them not misleading, for failure to disclose the information referenced in ¶80, supra, as well as for the following reasons:

a.    The Resonant Defendants' explanation of the Development Agreement's Milestones was materially misleading insofar as it omitted to disclose the extreme difficulties that the Resonant Defendants knew they would face with respect to Milestone 4 (as explained in ¶84 above); and

b.    The Resonant Defendants' statements that they were "beyond the steepest part of the S-8 development curve" on the Skyworks Duplexer and expected to achieve "design completion" by the first quarter of 2015 were materially misleading because the Resonant Defendants omitted to disclose that "design completion" would be materially limited by the fact that it was highly unlikely that Resonant would be able to meet Skyworks' very aggressive specifications.

92.     During the "question-and-answer" portion of Resonant's November 6, 2014 conference call, the Resonant Defendants made further materially misleading statements concerning Resonant's work on the Skyworks Duplexer.

93.     The Resonant Defendants recognized that moving from Milestone 2 to 3 required only minor design alterations compared to the shift from Milestone 3 to Milestone 4, which required for the first time a production-ready design, that was fully compliant with Skyworks' specifications.  The Resonant Defendants sought to preempt investor concerns by downplaying the difference in requirements between Milestone 3 and Milestone 4.  Therefore, in response to an analyst's questions, Lingren deemphasized the risk of the Company being unable to complete Milestone 4.  For example, Lingren indicated that it was "a good description" after an analyst inquired whether Resonant only had to "tun[e] up" its current design "to make it slightly better."  Likewise, Lingren did not dispel the optimism in the analyst's assessment that there were "not a lot of technical hurdles, very few, just blocking and tackling . . . to get the [design] through Milestone 4."  Instead, Lingren called the analyst's assessment "a fair characterization."

94.     By this point in time, the Resonant Defendants already knew that it was highly unlikely that Resonant would be meet Skyworks' "very aggressive" design specification and to complete Milestone 4.  Thus, page 3 of Resonant's May 28, 2014 IPO prospectus referenced that "Skyworks has developed a set of

proprietary specifications for our duplexer based on the demands of its customers." Moreover, the Company was required to allow Skyworks to "perform preliminary qualification tests" before achieving Milestone 3 and the Resonant Defendants represented that they remained in daily contact with Skyworks regarding its progress. Thus, the Company likely knew or recklessly disregarded that achieving Milestone 4 required far more than mere "fine tuning." Consequently, by this time, the Company knew or should have known that Resonant was unlikely to have a fully compliant design in accord with the Milestone 4 requirements. Indeed, expert analysis confirms that by November 6, 2014, Resonant had the final specifications and knew that it was highly unlikely that the Company would meet the specifications set forth in the Development Agreement for Milestone 4. Phinney Decl. ¶¶14-24.

95.     Nevertheless, the Resonant Defendants created and perpetuated the materially misleading impression that the Company was far closer to meeting Milestone 4 requirements than it privately admitted. More specifically, the Resonant Defendants publicly touted that the Company's design was "close to competitor performance." By this point, however, Resonant Defendants were aware that Skyworks' specifications were very aggressive, unmatched by *any* competitor's product, and unlikely to be met by the Company's current design.

## 2.   The November 12, 2014 Form 10-Q

96.   On or about November 12, 2014, the Resonant Defendants filed Resonant's Form 10-Q for the third quarter of 2014 with the SEC, signed by Defendant Philpott (the "November 2014 10-Q").   The November 2014 10-Q referenced Skyworks, the Skyworks Duplexer and the Development Agreement, informing *inter alia* that Resonant's "primary activity in the near term will be continued work on a duplexer design under our existing development agreement with Skyworks." *See* November 2014 10-Q at 20.

97.   The Resonant Defendants' filing of the November 2014 10-Q gave rise to a duty to disclose all material information, and the Resonant Defendants' representations therein concerning Skyworks, the Skyworks Duplexer and the Development Agreement gave rise to a duty to disclose material information concerning such matters necessary to make the Resonant Defendants' representations not misleading.

98.   The Resonant Defendants' November 2014 10-Q was materially misleading and/or omitted to state material facts requisite to render it not misleading, for failure to disclose the information referenced in ¶84, *supra*.

## 3.   The November 19, 2014 Misleading Statements

99.   On or about November 19, 2014, at approximately 3:30 p.m. Eastern Time, Defendant Lingren gave a presentation on Resonant to analysts and investors

1   attending the Southwest IDEAS Investor Conference, held at the Marriot – Quorum

2   Hotel in Addison, Texas.

3
4           100.   In his initial presentation, Defendant Lingren made particular

5   representations concerning Resonant's work for Skyworks, as set forth below:

6           So this first – we were in the middle of a development
            agreement – in fact *towards the end of a development*
7           *agreement with one of the biggest suppliers in this area.*
            We are passed. It's hard to tell from this slide, the colors
8           are kind of blended.  We just announced, we've passed
            milestone three, and we expect to finish our design next
9           quarter. So in Q1 2015, we should have a qualified chip.
            *Our customer will then take that and go through their own*
10          *qualification process, which could take up to six months.*
            *So we would expect to see first revenues from this product*
11          *in late 2015.*

12

13          The customers still could – they're not under obligation to
14          buy, so they still could decide not to license it if they did
            in which case we would take this and – this design and go
15          to another customer.  But some of the major terms are
            already defined in this development agreement.  Feel free
16          to ask questions as soon as we go through this. . . .

17                                  * * *

18          Here we are showing this kind of what we are doing now,
19          with our customers who is not a manufacturer, its
            Skyworks is our customer at present.  And they buy their
20          filters from a number of different filter manufacturers in
            the industry.  So we license the design to them.  We work
21          with them and with their fab to get the design into
            production.  We are in a royalty for that, the manufacturer
22          get the cell parts through Skyworks, the biggest consumers
            these filters in the world.  And *Skyworks sees the cost*
23          *benefit of being able to replace a BAW with a SAW.*

24   [Italics added for emphasis]

25          101.   Defendant Lingren's above-detailed statements in his November 19,
26
27   2014 Southwest IDEAS Investor Conference presentation were materially

28

misleading and/or omitted to state material facts requisite to render them not misleading, for failure to disclose the information referenced in ¶84, *supra*, as well as for the following reason.   Although repeatedly referencing Skyworks, the Skyworks Duplexer, the Development Agreement and the Milestones, Defendant Lingren omitted to disclose that the Resonant Defendants had to that point not been able to meet Skyworks' specifications, which they thought, based on their years of experience were "very aggressive" and that "nothing in the public literature" suggested that they had ever been met.

102.   Following Defendant Lingren's initial presentation, an attendee asked Defendant Lingren about the terms of Resonant's licensing agreement with Skyworks.  In response, Defendant Lingren stated:

> . . . [S]o the question is are these license terms, do they have a term, one year or two year is that something like that.  The license, *we're in a development agreement right now, we still have to sign the license agreement once we finished this first design. In the development agreement, they – our customer has an exclusivity period which we were not at liberty to say, it was redacted from the contract that we filed with our S-1.*  But so exclusivity is considered in the use – our customer has exclusivity to just that one band that we're designing for them so all of the other bands are still available.  We expect that some level of exclusivity, we'll go along with the use just because – our customers are going to have skin on the game too and they are going to won something and return to that, but its negotiable too.

103.   Defendant Lingren's above-stated response was materially misleading. Although correctly noting that Resonant was still operating pursuant to a development agreement with Skyworks, that licensing terms in that agreement

provided Skyworks with (confidential) time period in which it would have exclusive

rights to use Resonant's design for the Skyworks Duplexer, but that Resonant could

be able to provide similar products to different customers relating to all other

spectrum bands, Defendant Lingren's statement omitted to disclose that the

contemplated benefits from Skyworks, however limited or unlimited by licensing

terms, were based on the tenuous presumption that Skyworks would accept, approve,

license and pay for a design that failed to meet Skyworks' specifications.

### 4.     The December 19, 2014 Misleading Statements

104.   On or about December 19, 2014, at approximately 1:00 p.m. Eastern

Standard Time, Defendant Lingren gave a presentation on Resonant to analysts and

investors participating in conference call hosted by Ascendiant Capital Markets LLC

("Ascendiant"), and in particular by Ascendiant managing director and senior

research analyst Cody Acree, as part of Ascendiant's "Quarterly Management

Discussion Series" (the "Ascendiant Call").

105.   During the course of Ascendiant Call, Defendant Lingren expressed a

"high level of confidence" concerning Milestone 4, describing it as a "test we already

have the answers to" and adding that he did not expect to encounter any surprises.

Defendant Lingren also asserted that Resonant's relationship with Skyworks was

"very good," and that Resonant and Skyworks were holding conversations on a daily basis concerning "multiple products."[3]

106.   Defendant Lingren's above-detailed statements in Ascendiant Call were materially misleading and/or omitted to state material facts requisite to render them not misleading, for failure to disclose the information referenced in ¶84, *supra*, and because Defendant Lingren's assertions concerning his purported "high level of confidence" as to Milestone 4, characterizing Milestone 4 as "test we already have the answers to," were materially misleading in light of the omitted fact that Resonant was to that point unable to meet Skyworks' specifications, defendants considered these specifications to be "very aggressive," and Defendants had not seen anything in the public literature that complied with those specifications.

## 5.   The January 14, 2015 Misleading Statements

107.   On or about January 14, 2015, at approximately 4:50 p.m. Eastern Standard Time, Defendant Lingren gave a presentation on Resonant to analysts and

---

[3] No transcript or audio recording of the Ascendiant Call is currently publicly available.  Allegations concerning the Ascendiant Call are based on the accounts of analysts and investors who listened to and/or participated in the Ascendiant Call, and subsequently published such accounts on investment forums such as the Seeking Alpha website.  *See e.g.*: http://seekingalpha.com/article/2853696-skyworks-q1-call-underscores-need-to-acquire-resonant    and    http://seekingalpha.com/article/3014966-the-10-biggest-myths-about-resonant.

CONSOLIDATED SECOND AMENDED CLASS ACTION COMPLAINT
51

investors attending the 17th Annual Needham Growth Conference, held at the New York Palace Hotel.

108. In his initial presentation, Defendant Lingren made particular representations concerning Resonant's work for Skyworks, as set forth below:

> . . . This gets into the first design. . . [I]n fact we are almost at the end of this first design, collaborating with the biggest RF front-end supplier there is, and the value proposition is to replace one of the BAW-only bands with the SAW duplexer.
>
> We're in at the bottom, we showed the -- kind of the rough schedule milestones. *We're in phase four right now, we should finish this design acceptance this quarter. Our customer will then take that, go qualify the part with their fab*. Again, we're not manufacturing the parts, we are simply licensing the designs to them. *That could take as much as another six months to get the design qualified. So we would expect to see first revenues from this first product towards the end of this year*.
>
> * * *
>
> *So here are the key milestones we're looking at for 2015. We expect to, as I mentioned, achieve design acceptance for our first design this quarter. We expect first revenues from that by the end of this year, second half of this year*.

109. Defendant Lingren's above-detailed statements in his January 14, 2015 Needham Growth Conference presentation were materially misleading and/or omitted to state material facts requisite to render them not misleading, for failure to disclose the information referenced in ¶84, *supra*, and because Defendant Lingren's statements that Resonant would "finish this design acceptance this quarter" (or "achieve design acceptance this quarter"), after which Skyworks "will then take that, go qualify the part with their fab" which "could take as much as another six months,"

with the purported result that "we would expect to see first revenues from this first product towards the end of this year" were all materially misleading by virtue of the omitted fact that the Resonant Defendants knew that Resonant would unlikely be able to supply Skyworks with a design that met Skyworks' requisite performance specifications. That is because Resonant was aware that Skyworks' specifications were "very aggressive" and that "nothing in the public literature" indicated that the specification had previously been met. In addition, Resonant was aware that Skyworks would have little reason to "accept" a noncompliant design, let alone agree to manufacture it and pay Resonant for it.

**6.    The Resonant Defendants' February 26, 2015 Partial Corrective Disclosure, Admissions and Further Misleading Statements**

110.   On February 26, 2015, after the market closed, Resonant: (1) issued a press release entitled, "Resonant Inc. Reports 2014 Financial Results and Provides Business Update;" (2) filed a Form 8-K with the SEC, attaching the February 26, 2015 press release as an exhibit thereto; and (3) held a conference call with analysts and investors, beginning at 5:00 p.m. Eastern Standard Time, to further discuss its operations and results of operations, and to answer questions from analysts and investors concerning the same.

111.   During the course of the above-identified February 26, 2015 public statements, the Resonant Defendants:

a.    partially-correcting their prior misleading statements, disclosed that the Skyworks Duplexer did not meet applicable specifications (*see* Section VI.A.6.a, *infra*);

b.    admitted that they had known that the Skyworks Duplexer did not meet the applicable specifications (*see* Section VI.A.6.b, *infra*), when they submitted the Milestone 4 Skyworks Duplexer to Skyworks; and

c.    admitted that throughout the Exchange Act Class Period the Resonant Defendants believed Skyworks' specifications to be "very aggressive" and they had not seen anything in the public literature that had met those specifications;

d.    made further materially misleading statements concerning Skyworks and the Skyworks duplexer in an effort to keep investors upbeat about Resonant's prospects *vis-à-vis* Skyworks (*see* Section VI.6.b, *infra*).

### a.  The Resonant Defendants' February 26, 2015 Partial Corrective Disclosure:  the Skyworks Duplexer's Failure to Meet Applicable Specifications

112.   In the February 26, 2015 press release, the Resonant Defendants revealed for the first time that the RF Filter design that they had developed for and submitted to Skyworks did not in fact meet the agreed-upon performance specifications set forth in or pursuant to the Development Agreement.

113.   In relevant part, the Resonant Defendants' February 26, 2015 press release, quoting Defendant Lingren, stated:

> We have delivered a completed duplexer design for consideration to our first customer.  Our design does not meet all the specifications in the development agreement, but we believe it delivers competitive performance, which we view as a major accomplishment. Our customer's decision whether to use our design is complex and based on a number of considerations, many of which are beyond our control.

114.   Resonant's February 26, 2015 press release contained numerous further disclosures, including *e.g.*: (1) 2014 financial results; (2) recapping "highlights" of 2014 operations, including Resonant's IPO, the purported "significant progress on the Company's first product design for a major customer," the expansion of its patent portfolio to more than 50 issued/pending patents; the build-out of Resonant's senior management team, technical/R&D staff, and a new electronics laboratory; and the commencement of work to develop a tunable RF filter; and (3) representations that Resonant was now evaluating multiple RF filter opportunities, was in "active discussions with other potential customers" and expected to acquire "an additional customer" (*i.e.*, a customer in addition to Resonant's first customer, Skyworks) during the first half of 2015.  None of these other disclosures, however, were notably new or material.

115.   Resonant analysts and investors found *particularly* material the Resonant Defendants' February 26, 2015 disclosure that the RF filter design that Resonant had submitted to Skyworks did not meet the agreed-upon specifications

set forth in or pursuant to the Development Agreement.  The overwhelming salience of this particular disclosure for Resonant analysts and investors is clearly demonstrated by Resonant's February 26, 2015 conference call, whose Q&A period was consumed in effective entirety by analysts and investor questions concerning this very disclosure.  For example:

    a.    Seven different Resonant analysts and/or investors asked questions during the February 26, 2015 conference call, and all seven asked questions about Skyworks, the Skyworks Duplexer that Resonant was developing for Skyworks, and/or the failure of such product to meet specifications.[4]

    b.    These seven analysts and investors asked approximately 24 questions, of which approximately 14 (*i.e*, 58%) were explicitly related to Skyworks, the Skyworks Duplexer, and/or its failure to meet specifications.[5]

---

[4] The seven analysts and/or investors were, in order of appearance: Krishna Shankar of ROTH Capital; Quinn Bolton of Needham & Co.; Louis Basenese of Disruptive Tech Research; Siddharth Sinha of Canaccord Genuity; Jeff Kone of Wall Street Capital Partners; Brett Conrad of Longboard Capital; and Mark Bronzo of Nudge Capital.

[5] Numbers are "approximate" in light of potential differences in how observers might classify certain questions (for example, do two consecutive and directly-related questions constitute two different questions, or two parts of the same question)?  The

c.  Indeed, the remaining 10 questions, which concerned Resonant's potential prospects for other products (*e.g.*, its tunable filter prototype) or for other customers (*e.g.*, other RF front-end manufacturers or integrators), and the potential timelines associated with such other product/customer opportunities, were *also* directly connected to Resonant's February 26, 2015 disclosure concerning Skyworks.  These other questions, all oriented at evaluating Resonant's potential prospects and timelines for generating revenue from *other* potential customers/products, were motivated by analysts' and investors' newfound concerns, in light of the Resonant Defendants' February 26, 2015 disclosures concerning Skyworks, that Resonant's ability to generate revenues from its Skyworks project was more tenuous than previously indicated.

115.  Consequently, the immediate and severe decline in Resonant's share price following the Resonant Defendants' February 26, 2015 disclosures (*see* Section VI.C, *infra*) constituted the market's response to this particular disclosure.

**b.  The Resonant Defendants' February 26, 2015 Admissions that They Had Long Known that the Skyworks Duplexer Would Unlikely Be Able to Meet**

larger point is established in any event, and notwithstanding any such potential, minor differences.

CONSOLIDATED SECOND AMENDED CLASS ACTION COMPLAINT

57

**The Very Aggressive Specifications And Had Already Delivered a Non-Compliant Design**

116.   Unbeknownst to Plaintiffs and members of the Exchange Act Class, at all times, during the Exchange Act Class Period, the Resonant Defendants knew that they had been unable to meet the specifications for the Skyworks Duplexer, they believed these specifications to be extremely aggressive, and they had seen nothing in the public literature that met those specifications.  Thus, unbeknownst to Plaintiffs, Exchange Act Class members and market – the Resonant Defendants had instead pinned their hopes for success not on meeting specifications, but on delivering a "competitive" product that Skyworks would accept, notwithstanding its failure to meet the specifications.

117.   Specifically, and as Defendant Lingren admitted during Resonant's February 26, 2015 conference call, the specifications set forth in or pursuant to the Development Agreement were not merely "very aggressive," but had not already been met by *any* known product (including better-performing BAW filters):

> Our next question comes from Quinn Bolton with Needham & Company. Please proceed.
>
> <Q - Quinn Bolton>: Terry, just a quick follow-up. You talked about sort of set of specs that you're trying to reach. Is there a BAW solution today that those specs are based on or is that almost an ideal set of specs that was the wish list that the customer had that perhaps even existing BAW filters might not achieve every spec.
>
> <A - Terry Lingren>: Well, I have not evaluated every BAW in the industry in this band, whereas our customer probably has.  *These specs are very aggressive* and certainly for the size that we're targeting.  So, I don't know, I don't know for sure and I hesitate to speculate on

CONSOLIDATED SECOND AMENDED CLASS ACTION COMPLAINT
58

the call. *I do think that these are very aggressive specs,
there is certainly nothing in the public literature we seen
that meet all of the specs that are in ours at the moment.*

<Q - Quinn Bolton>: So some of the existing BAW filters
that you've seen may not have met those specs either? I'm
not trying to put words in your mouth, but it sounds like
that maybe a true statement.

<A - Terry Lingren>: It's possible.

[Italics added for emphasis]

118.   Likewise, as Defendant Lingren further admitted during Resonant's

February 26, 2015 conference call, the Resonant Defendants knowingly delivered a

non-compliant product to Skyworks because:  (1) they believed that no matter how

much more additional time they could have taken to try to meet the specifications,

the specifications were very aggressive and unlikely  to be met and Resonant would;

and (2) the inability to meet specifications aside, the Resonant Defendants believe

that their product was "competitive."

Our next question comes from Lou Basenese of Disruptive
Tech Research.  Please proceed.

<Q - Louis Basenese>: Hey Terry, hey John.  Can you give
us any color around when you delivered the duplexer to
the customer?

<A - Terry Lingren>: Well, we've been delivering designs
all through the process, we have gone through that path 15
months or so of development work. *The last design which
we're calling the final version of this design was delivered
within the last month.*

* * *

 Our next question comes from [ph] Jeff Kone (28:02)
with Wall Street Capital Partners.  Please proceed.

<Q>: Hi, Terry. I wanted to get some more color on
delivering the design, *why would you deliver a month ago
if it didn't meet the specifications of the agreement?  Why
wouldn't you just continue working on it until it's done?*

CONSOLIDATED SECOND AMENDED CLASS ACTION COMPLAINT
59

And the parts where it didn't meet, does that have to do with cost or efficiency or what type of area? Is it a material area where it didn't meet the agreement?

<A - Terry Lingren>: *The specs we're talking about are all performance specs* and it sounds like there are a lot but there aren't. It's around the – you have to understand filters and what all of the list of specifications that a particular part has to meet and some of those we don't. *But we thought that we had a design which was competitive. In addition, our customer's clock has – they're getting anxious, and so we felt we have a competitive product* and we have submitted that for their consideration.

<Q>: So, if you would have worked it out longer, could you've gotten to the point where it would satisfy the agreement or what was the problem there?

<A - Terry Lingren>: *We will continue to work on it.* As I've mentioned in one of my previous answers, we believe that there are – this is a continual evolution of specifications, including not only the segment performance, but size and cost, the way this market proceeds. *So we will always be working on this.* I think that this is part of the original development contract which is getting a little perhaps long in the tooth at this point. . .

[Italics added for emphasis]

119. Lastly, the Resonant Defendants knew – when they delivered the Skyworks Duplexer to Skyworks in purported completion of Milestone 4 – that the delivered product did not in fact meet the Development Agreement's specifications.

120. Specifically, and as Defendant Lingren admitted during Resonant's February 26, 2015 conference call (*see* quotation in ¶118, *supra*):

    a.    The Resonant Defendants had delivered the Skyworks Duplexer to Skyworks "within the last month," and

    b.    The Resonant Defendants delivered the Skyworks Duplexer to Skyworks, knowing it did not meet performance specifications,

because Skyworks was "getting anxious" and the Resonant Defendants believed they had a "competitive product" (which they "will always be working on" in an effort to meet the "very aggressive" specifications).

**B.    The Resonant Defendants' February 26, 2015 Further Misleading Statements Concerning Skyworks and the Skyworks Duplexer**

121.   On February 26, 2015, the Resonant Defendants sought to mitigate the potential negative impact of their belated disclosure with extensive, speculative, positive, and materially misleading further statements concerning Resonant's relationship with Skyworks and Resonant's purported ability to still win Skyworks' business.

122.   For example, in Defendant Lingren's opening remarks during Resonant's February 26, 2015 conference call, Defendant Lingren surrounded the negative disclosure that Resonant's RF filter for Skyworks failed to meet agreed-upon specifications with numerous positive disclosures asserting, *inter alia*, that Resonant's RF filter could still be used by Skyworks for Skyworks' initially-intended RF front-end product (which would generate revenue for Resonant within 2015), that it could also be used for multiple related and subsequent Skyworks RF front-end products, that Resonant had "made substantial progress" with potential new customers for similar products, and that Resonant expected any such future

projects to be completed at "greatly accelerate[d]" speeds as a result of various improvements learned during the course of Resonant's work for Skyworks:

> Now, I would like to dive into the overall status of the company and comment on our plans for 2015 and beyond. Let me start by providing you an update on our first product line, which as I said we call single-band filters.

> Our first product development is the design of a SAW filter with BAW performance for a leading RF manufacturer. *This customer remains an excellent partner for Resonant* having large market share in complex smartphone and purchasing a variety of filters at high volume. As planned, we have delivered a completed duplexer design for consideration to our first customer.

> *Our design does not meet all the specifications in the development agreement, but we believe it delivers competitive performance, which we view is a major accomplishment. Our customers' decision whether to use our design is complex based on a number of considerations,* many of which are beyond our control.

> *As the standard in this industry, the duplexers for a particular band can be used in multiple products over an extended timeframe, therefore our design could be used in several products. If we're selected for the first product in the series, we believe we will have revenues by the end of this year as we've been guiding.*

> *Regardless, we believe there will be opportunities on a regular basis to compete in subsequent products using the same bands with this customer.* In tandem, let me emphasize that we're in discussions with other potential customers. We have made substantial progress on this front in the past few months. We anticipate engaging with at least one new customer in the first half of 2015. We believe that the improvements we have made in our tools and models over the course of our first project will greatly accelerate future design and improve our efficiency to drive the increase of concurrent project.

> Our goal is to have five or more single-band projects in development simultaneously by year-end, fully consistent with the goal of doubling the size of our design team. . .

[Italics added for emphasis]

123.   Similarly, in the Q&A session of the February 26, 2015 conference call, Defendant Lingren, after refusing to provide any details on the specifications miss (purportedly due to consideration of Skyworks' confidentiality concerns), turned more voluble (and less considerate of Skyworks' confidentiality concerns) in detailing purported further opportunities that Resonant could have in connection with Skyworks' future products:

> <Q - Quinn Bolton>: Hi, Terry. I apologize. I missed the first couple of minutes of your prepared comments, but *you talked about the design not meeting all of the specifications in the development agreement.  Can you provide any more color on specifically what types of specs perhaps didn't meet the customer's requirements?*
>
> <A - Terry Lingren>: *No, I did not give any more detail around that.  As much as I'd love to discuss it in detail, it does get pretty technical pretty quickly and plus it's pretty confidential between us and the customer.*  So...
>
> <Q - Quinn Bolton>: Okay.
>
> <A - Terry Lingren>: *So, that's about as much as I can say.*
>
> \* \* \*
>
> <Q - Quinn Bolton>: Okay.  If they decide not to use the first generation, do you have – are there discussions going on about another iteration of that filter or of that duplexer for that specific band or other bands that you're discussing with this customer or is it too early to talk about other bands?
>
> <A - Terry Lingren>: *Well, I respect the confidentiality with our customer.  That said,* it is industry practice to have a series of products.  All of these big manufacturers making modules for the phone manufacturers have a series of products.  *They're looking out 18 months, 24 months, 36 months, and have their own road maps.  And so we have had discussions around those products and continue to look at those too.  I think that there are products behind this one and then another one, and then another one.  We feel we got competitive performance right now.  So yeah,*

*not too much detail around that, but hopefully it gives you some flavor.*

[Italics added, for emphasis]

124.   Similarly, in answering another series of questions from analyst Jeff Kone, Defendant Lingren attempted to recast Resonant's failure to meet specifications as a "very positive" development that left Resonant positioned "exactly where we wanted to be" with Skyworks:

> <Q – Jeff Kone>: So, if you would have worked it out longer, could you've gotten to the point where it would satisfy the agreement or what was the problem there?
>
> <A - Terry Lingren>: We will continue to work on it.  As I've mentioned in one of my previous answers, we believe that there are – this is a continual evolution of specifications, including not only the segment performance, but size and cost, the way this market proceeds.  So we will always be working on this.  I think that this is part of the original development contract which is getting a little perhaps long in the tooth at this point. *But we're moving into more of a vendor relationship with our customer now and out of the development realm.  I think this is very positive.  This is exactly where we wanted to be.*

[Italics added for emphasis]

125.   Defendant Lingren's above-detailed characterization of Resonant's February 26, 2015 news provoked a somewhat surprised response from analyst Jeff Kone:

> <Q – Jeff Kone>: Okay, it just doesn't read that way in the release, that's all.
>
> <A - Terry Lingren>: Yeah. Did you have another question? Okay.

126.   Similarly, and after yet further questions from further analysts concerning Resonant's specifications miss with respect to the product being

developed for Skyworks, Resonant's Chief Financial Officer John M. Philpott spontaneously intervened into the Q&A.   Noting that Defendant Lingren was "getting a variety of questions on" the issue of "not meeting specs," Mr. Philpott jumped in "just to kind of clarify some things" – and, specifically, to assert that "our statement about not meeting specs does not mean that don't have an opportunity to get there still" (an assertion to which Defendant Lingren immediately and heartily agreed):

> **<A - John M. Philpott>**: Terry, this is John. Terry, I wanted to add too. Maybe there is – just to kind of clarify some things.  *Not meeting specs doesn't mean that we don't have an opportunity to be a product for our customer. It seems like you're getting a variety of questions on that and I just want to be clear that our statement around not meeting specs does not mean we don't have an opportunity to get there still.*

> **<A - Terry Lingren>**: *Absolutely, that's absolutely correct.*

[Italics added for emphasis]

127.   By February 26, the Resonant Defendants, who had been in daily contact with Skyworks, knew that Skyworks had grown "anxious" and demanded the completed design notwithstanding the fact that Resonant's design did not meet Skyworks' specifications, and then Skyworks had preliminarily rejected the design as non-compliant.   Surely, by this time, the Resonant Defendants had to have recognized the strong likelihood that Resonant was looking to move in a different direction.   But rather than come completely clean with investors, the Resonant Defendants chose instead to put a misleading optimistic gloss on this news and try

to convince investors that Resonant remained well-positioned to win Skyworks' business, notwithstanding Resonant's failure to meet the design specifications.

### C.    Market Reaction to the February 26, 2015 Disclosures

128.    Following the Resonant Defendants' post-close February 26, 2015 disclosures – including the disclosure that the Skyworks Duplexer failed to meet agreed-upon specifications – Resonant shares suffered severe market devaluation on the immediately-following trading day, February 27, 2015.

129.    Specifically, Resonant shares lost 32.8% of their value, falling $5.07 per share from their February 26, 2015 closing price of $15.47 to close on February 27, 2015 at $10.40 per share.  February 27, 2015 trading volume of 1.429 million shares was approximately 14 times greater than the Resonant's average daily trading volume between the May 28, 2014 IPO (the date of the Resonant IPO) and April 2, 2015, which slightly exceeded 100,000 shares per day).

130.    Notwithstanding the severity of the market's devaluation of Resonant following the February 26, 2015 disclosures, Resonant shares still continued to trade at artificially inflated prices after February 26, 2015 as a result of the Resonant Defendants' further, positive and materially misleading February 26, 2015 statements (as detailed in Section VI.B, *supra*).

### D.   The April 2, 2015 Corrective Disclosure

131.   On April 2, 2015, after the market closed, Resonant: (1) issued a press release entitled, "Resonant Inc. Provides Update on First Customer Relationship;" and (2) held a conference call with analysts and investors, beginning at 5:00 p.m. Eastern Standard Time, to further discuss, and to answer questions from analysts and investors concerning, the same.   Additionally, due to the "limited notice" provided to Resonant analysts and investors with respect to the April 2, 2015 conference call, Resonant held a second call on the same topic on April 6, 2015, at 1:00 p.m. Eastern Standard Time.

132.   Resonant's April 2, 2015 press release stated:

> **Resonant Inc. Provides Update on First Customer Relationship**
>
> **— Company to Host Conference Call Today at 5:00 p.m. Eastern Time —**
>
> SANTA BARBARA, Calif.—April 2, 2015 — Resonant Inc. (NASDAQ: RESN), a late-stage development company creating innovative filter designs for radio frequency front-ends (RFFEs) for the mobile device industry, today provided an update on the relationship with and first design project for its first customer.
>
> In February, Resonant management discussed the transition of its relationship with its first customer from development to commercialization. *This week, Resonant received notice that the development agreement with its first customer has been terminated*, and that Resonant must pursue commercialization of its designs with this customer by working directly with the filter manufacturer. Resonant intends to collaborate with the filter manufacturer to continue to submit improved product designs for consideration by this customer for insertion into its product modules.
>
> Terry Lingren, Chairman, Co-Founder and CEO of Resonant, stated, "The Development Agreement has

accomplished a principal purpose – to enable Resonant to develop a beyond-state-of-the-art filter design capability. This was only possible through sustained commitment from our first customer over the past several years. *While the probability has been reduced that our design will be selected for the customer's original target product*, we believe that the design for the band that we developed for the original product could be considered by this customer for use in next generation, follow-on modules. Additionally, as a result of the customer's termination of our development agreement, we are now permitted to market the design for the same band to other potential customers.

"We would like to reiterate that we are on track to develop a filter design for our second customer that we expect to deliver in less than a year. We also expect to complete our prototype tunable filter before year end, as planned. Resonant's thesis and business model remain unchanged. By the end of this year, we expect to have multiple products in development for consideration by several customers. *Given recent developments with our first customer, however, we are re-evaluating our prior guidance regarding the timing of receipt of our first revenues.*"

Conference Call Details

Resonant will host a conference call today at 5:00 p.m. Eastern time (2:00 p.m. Pacific time) to answer any investor questions related to this announcement. . .

[Bold in original; italics added for emphasis]

133. Resonant's April 2, 2015 press release both corrected the Resonant Defendants' materially misleading February 26, 2015 statements and marked a further materialization of the risk that the Resonant Defendant's pre-February 26, 2015 statements had omitted, obscured and/or obfuscated. Specifically, the Resonant Defendants conceded on April 2, 2015:

   a.   that, as a result of Resonant's submission of an RF filter design that failed to meet the agreed-upon specifications set forth

CONSOLIDATED SECOND AMENDED CLASS ACTION COMPLAINT
68

pursuant to the Development Agreement, Skyworks had elected to terminate the Development Agreement – an election that was not merely an "option" for Skyworks under the Development Agreement, but rather constituted, as the Development Agreement itself stated, Skyworks' "sole remedy and recourse," under the Development Agreement, in the event that Resonant provided it with product that "does not conform to the specifications, success criteria or requirements" set forth in or pursuant to the Development Agreement;

b.    that, in light of Skyworks exercise of such "sole remedy and recourse" to terminate the Development Agreement, "the probability has been reduced that our design will be selected for the customer's original target product;"

c.    that, in light of the fact that it Skyworks was now less likely to use Resonant's RF filter in Skyworks' current generation of RF front ends, the prospects for any revenue flows from such product or from Skyworks had receded, and that the Resonant Defendants were therefore "re-evaluating our prior guidance regarding the timing of receipt of our first revenues."

134.   During the conference calls held in conjunction with and following Resonant's April 2, 2015 disclosures, Resonant shareholders complained that the Resonant Defendants had misled them with respect to Resonant's purported progress on the Skyworks Duplexer and with respect to the Development Agreement Milestones.   For example, during Resonant's April 6, 2015 conference call, Resonant investor Richard King complained that Resonant shareholders were not "handled properly" because the Resonant Defendants "said nothing to us" even as they "knew that Milestone IV was not met" and "submit[ted] chips anyway to hopefully be adequate:"

> **Operator**:  Thank you.  And our last question comes from a line of Richard King, private investor.  Please, proceed with your question.
>
> * * *
>
> **Richard King**: Thank you.  One other question.  Just as far as handling investors.  *The impression that was created, at least in my mind, was that Milestone III was extremely difficult.  Milestone IV to a degree was almost a formality, and that may be an oversimplification.  But when it was found that Milestone IV was not met and you were going to submit chips anyway to hopefully be adequate, but Milestone IV was not going to be met, we as investors were waiting to hear about Milestone IV.  And you knew that Milestone IV was not met and for a month you said nothing to us.  Now, maybe I misinterpret everything, and that is a possibility, but whatever it is, I don't feel like we were handled properly*, and I am hoping if you go with the idea of not making, or keeping your statements conservative as you said earlier, that you will tend to keep us more informed.
>
> **Terry Lingren**: Thanks for the feedback.  And I am sorry that you felt that way.  We had talked about submitting parts for this Milestone IV that did not meet the specs.  And, I think I mentioned on the February call that part of this was time-driven, as I answered one of the questions earlier.  This development agreement, not necessarily on

the product side of the house, but certainly on the R&D side of the house had gone for quite a while.  Even though there was no specific ending point, there was some sense of urgency, and on our customer's part if nothing else, to get to some conclusion.  And so we submitted part for Milestone IV that did not meet full specs and we had said that, but that is it.  On the vendor, the product side of the house, the parts are competitive.  They do have competitive performance even though not meeting 100% of the specs.  So… But we will try.

[Italics added for emphasis]

135.    The Resonant Defendants' post-close April 2, 2015 disclosures occasioned further and severe market devaluation of Resonant stock.   On the immediately-following trading day, April 6, 2015, Resonant shares lost 40.3% of their remaining, already-diminished value, falling $2.98 per share from their April 2, 2015 closing price of $7.39 to close on April 6, 2015 (the subsequent trading day) at $4.41per share.  April 6, 2015 trading volume of 1.676 million shares was more than 15 times greater than the Resonant's average daily trading volume between the date of the Resonant IPO and April 2, 2015.

E.      **The Resonant Defendants'** *Scienter*

136.    The Resonant Defendants acted with *scienter* in that they knew that the public documents and statements issued or disseminated in the name of the Company, as well as the above-identified statements made by the Individual Defendants during Resonant's conference calls, were materially misleading and/or omitted to state material facts; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially

participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

137.   The Resonant Defendants' *scienter* is indicated the below-detailed facts, which give rise to a cogent and compelling inference of *scienter*.

138.   First, as set forth in ¶80 and Section VI.A.6.b, *supra*, the Resonant Defendants knew that the performance specifications for the Skyworks Duplexer were very aggressive and unlikely to be met, and knew, when delivering their purportedly completed product to Skyworks, that it did not meet Skyworks' specifications.  Indeed, Defendant Lingren so admitted during Resonant's February 26, 2015 conference call with analysts and investors.  *See* Section VI.A.6.b, *supra*.

139.   Second, the development of the RF filter product for Skyworks constituted, throughout the Class Periods (as well as all times prior thereto), Resonant's "core operations."

a.   Indeed, at all times until March 2015, Resonant possessed only one single customer (Skyworks), for whom it was developing one single product, and Resonant's only non-Skyworks-related operations consisted of its separate efforts to develop a prototype second product (a tunable RF filter).  Consequently, at a minimum, Resonant's Skyworks-related operations are properly

deemed Resonant's "core operations" because they were – in effect – Resonant's *only* operations.

    b.    Relatedly, Resonant's SEC filings indicate that the lion's share of Resonant's technical personnel, and of Resonant's research and development expenses, related to Resonant's efforts to develop an RF filter for Skyworks. *See e.g.*

        i.    Resonant Prospectus at 49 ("Our research and development efforts are focused currently on the development of a duplexer design for Skyworks. . . We expect expenditures on this duplexer design to continue increasing in 2014 as we hire additional technical staff for this project.");

        ii.    November 2014 10-Q at 22 ("Our research and development efforts are focused currently on the development of a duplexer design for Skyworks under the development agreement. We expect expenditures on this duplexer design to continue increasing in 2014 and into 2015 as we hire additional technical staff and invest in equipment, software and supplies for the duplexer design . . .");

CONSOLIDATED SECOND AMENDED CLASS ACTION COMPLAINT

73

iii.　　November 2014 10-Q at 23 ("Research and development expenses increased from $685,000 in the first nine months of 2013 to $2.0 million in the first nine months of 2014. The increase of $1.3 million is the result of the increased payroll, consulting costs and development costs related to increased activity on a duplexer design under development for a customer.").

c.　Moreover, Defendants' repeated assertions of the *materiality* of the Skyworks work/product to Resonant (as detailed in Section V.E, *infra*) further support a "core operations" inference.  As Defendants repeatedly explained and as set forth in Section V.E *infra*: (1) as Resonant's "burn rate" required Resonant to generate revenues by early/mid-2016 (or face drastic consequences, such as bankruptcy or potentially-dilutive refinancing); and (2) as Resonant's Skyworks-related operations were the only operations providing Resonant with any potential avenue to revenue generation by early/mid-2016 or before; therefore (3) Resonant's very viability – its ability to continue as a "going concern" – was in substantial part dependent on its work for Skyworks.

d.    Indeed, Defendants themselves repeatedly described Skyworks-related work as Resonant's "primary activity" or "principal focus" at all times from Resonant's inception through the 1st quarter of 2015.  *See e.g.*:

i.    Resonant Prospectus, at 43 ("Our primary activity in the near term will be continued work on a duplexer design under our existing development agreement with Skyworks."); *see also* Resonant August 13, 2014 press release (same); August 2014 10-Q at 24 (same); November 2014 10-Q at 20 (same);

ii.   Resonant Form 10-Q for the first quarter of 2015, filed with the SEC on or about May 6, 2015 ("May 2015 Form 10-Q"), at 5 ("We completed our first single-band filter design (a duplexer) in the first quarter of 2015.  This project has been our principal focus since inception.");

iii.  Resonant Prospectus, at 49 ("Our research and development efforts are focused currently on the development of a duplexer design for Skyworks under the development agreement. . .  We expect expenditures on this duplexer design to continue increasing in 2014 as we

CONSOLIDATED SECOND AMENDED CLASS ACTION COMPLAINT

75

hire additional technical staff for this project"); *see also* November 2014 10-Q at 22 (same).

e.    Indeed, expert analysis suggests that it is more likely than not that by November 6, 2014, Resonant's management team knew that it was highly unlikely that they would meet the specifications set forth in the Development Agreement for Milestone 4.  *See* Phinney Decl. ¶¶19-24.

140.   The facts set forth in ¶139(a)-(e) *supra* all support a conclusion that work for Skyworks constituted Resonant's "core operations."   Consequently, Defendants' *scienter* concerning such core operations – and, specifically, Skyworks' requisite specifications and the failure of the product developed for Skyworks to meet such specifications – may be inferred.

141.   Third, relatedly, Resonant was at all relevant times a very small company.  During the Class Periods, Resonant had only between 15 and 25 total employees:  approximately 15 at the time of its IPO, and approximately 25 by April 2015, due to substantial hiring of additional personnel.  Resonant's very small size further supports an inference of *scienter*, making it less likely that operational details were known only by front-line technical personnel, and making it more likely that operational details were fully known by Resonant's senior executives and officers.  Again and as per "Second" above, the importance of these "core operations" for

CONSOLIDATED SECOND AMENDED CLASS ACTION COMPLAINT

Resonant's viability as a going concern make it all the more likely that operational details were fully known by Resonant's senior executives and officers.

142.   Fourth, Resonant's three co-founders – including Resonant's CEO (Defendant Lingren), Resonant's COO (Neal Fenzi), and Resonant's Chief Technology Officer (Robert Hammond) – possessed primarily "technical" or "scientific," rather than "business" or "management," backgrounds.

    a.    For example, all had earned advanced degrees in Electrical Engineering or Applied Physics. Resonant COO Fenzi possessed a Bachelor of Science degree in Electrical Engineering; Resonant CEO Lingren both Bachelor and Masters of Science degrees in Electrical Engineering; and Resonant CTO Hammond a Ph.D. in Applied Physics from Caltech.

    b.    Likewise, all had spent the bulk of their working lives in engineering roles (Lingren and Fenzi), or in technology/research (Hammond). Prior to founding Resonant:

        i.    Mr. Fenzi had served as Vice President of Engineering and Chief Engineer at STI (from which Resonant was spun off);

ii.     Defendant Lingren had served as Vice President of Engineering at Qualcomm from 1999-2003, and at Kyocera from 2003-2013; and

iii.    Mr. Hammond had served for than 20 years as STI's Senior Vice President and Chief Technology Officer (prior to which he worked in Los Alamos National Labs as Leader in Electronics Advanced Development).

c.    Relatedly, Resonant's SEC filings warned that Resonant's management team (consisting largely Resonant's co-founders, Messrs. Lingren, Hammond and Fenzi) had limited experience in management and in financial reporting, and that their performance in such roles "may not be adequate" and could suffer from "substantial deficiencies." *See e.g.* Resonant 2014 Form 10-K at 21.

d.    The same SEC filings also:

i.     made no similar warnings concerning any limits to the management team's *technical* abilities; and

ii.    identified each of the three above-mentioned Resonant co-founders as Resonant "key employees" whose loss "would be material to us" and "could severely and negatively

impact our operations." *See e.g.* Resonant 2014 Form 10-K at 21.

143.   The facts set forth above at ¶142(a)-(d) all further indicate that Messrs. Lingren's, Fenzi's and Hammond's roles in Resonant were not limited to purely managerial or executive functions, but rather and to the contrary, indicated that they were highly – and in all likelihood, primarily – involved in Resonant's technical operations.

144.   This is concretely illustrated, for example, in the Resonant Defendants' December 10, 2014 press release announcing Mr. Fenzi's promotion to Resonant's Chief Operating Officer.  As Defendant Lingren explained therein, the promotion "recognized the role Neal [Fenzi] already plays as head of research and product development for the Company.  Neal has been instrumental in our product development endeavors and has been a critical member of Resonant's leadership team since our formation . . ."

145.   Fifth, at least two of Resonant's three co-founders – specifically, Messrs. Hammond and Fenzi – were long and highly familiar with Resonant's proprietary RF filter design technology (*i.e.*, ISN) because *they had previously created and developed that technology* from 2005-2010 when working at STI.  *See e.g.* March 10, 2015 Resonant "Corporate Presentation" at 7 ("Our team created ISN from 2005 through 2010 at Superconductor Technologies, Inc. (STI) . . .  Resonant

was started in 2012 and acquired the IP and related technology from STI in July 2012").[6] *See also*:

      a.    Resonant August 13, 2014 conference call transcript, at pp. 2-3:

> . . . Second, in the competitive advantages, we have a growing suite of proprietary software design tools. *We developed these design tools over the course of 15 years, counting back to the days of Superconductor Technologies or STI.* These superior tools are what allow us to realize unique filter designs and would be very hard to replicate.
>
> Third, we have a highly-experienced design team that would be difficult to match. *Our team created the fundamentals of ISN from 2005 through 2010 at STI.* In fact, the RF filters this team made for wireless base stations are the highest-performance RF filters ever put into production.
>
> *Resonant is comprised of physicists and engineers who develop these highly complex filter designs over many years.* I encourage you to check out the bios of each of our senior leaders as this is the team that has all the right qualifications for driving innovation and ensuring our success. I don't want investors to underestimate how challenging it would be for a competitor to assemble a team of similar caliber.

[Italics added for emphasis]

      b.    Resonant Prospectus at 38 (noting that "many" of Resonant's employees "worked together as a team at STI on the original development program for our technology");

      c.    Resonant Prospectus at 28-29 (setting forth Resonant's "history" and explaining how (a) Mr. Hammond, while working as STI's Chief Technology Officer, had overseen an STI program

---

[6] Available at http://ir.resonant.com/presentations.

exploring RF filter technology between 2007-2010, (b) STI halted RF filter work in 2010 to focus on developing superconducting wire, (c) Mr. Hammond "continued to believe in the potential of STI's RF filter technology for mobile devices and championed its further development," and (d) Mr. Hammond recruited Messrs. Lingren and Fenzi to join him in co-founding Resonant in May 2012 and obtaining STI's RF filter technology and patents (together with further contributions from STI, such as software, equipment, office space, and an early version of a development agreement with Skyworks).

146.   The facts set forth at ¶145(a)-(c), *supra,* further support an inference of *scienter,* given that two of Resonant's officers and co-founders were long and intimately familiar with Resonant's proprietary RF filter design technology.

147.   Sixth, concretely confirming "Second" through "Fifth" above, Defendants have themselves admitted that a substantial portion of the Resonant's co-founders' time was in fact spent on RF filter design:

> **Our three founders divide their time between filter design and administrative matters**.

*See* Resonant Prospectus, at 38 (emphasis added); Resonant 2014 Form 10-K at 14 (same).

148.   This admission further supports an inference of the Resonant Defendants' *scienter*. As (1) a meaningful portion of the time of Resonant's co-founders (all of whom were senior officers of Resonant) was spent in direct involvement in RF filter design, and (2) as the largest part of Resonant's RF filter design operations was Resonant's work for Skyworks, this admission consequently (3) indicates that Resonant's co-founders were substantially and directly involved in work for Skyworks.

149.   Seventh, relatedly, this indication is further supported by the Resonant Defendants' own more-detailed descriptions of relations between themselves and Skyworks, provided in conference calls with Resonant analysts and investors, which revealed that communications between Skyworks and the Resonant Defendants were frequent and intensive.  For example:

a.    During the December 19, 2014 Ascendiant Call, Defendant Lingren represented that Resonant and Skyworks were having conversations on a daily basis and across all levels of their organizations;

b.    During Resonant's February 26, 2015 conference call, Defendant Lingren made numerous representations concerning Resonant's working relationship with Skyworks, explaining *inter alia*:

i.      that Resonant had "interactions with them [Skyworks] *on a daily basis*" (italics added for emphasis);

ii.     that Resonant received "continual feedback from them [Skyworks] on where to improve and where we might even to be able [sic] to give up a little bit, where other things are better in their module," and that "that kind of feedback is constant;" and

iii.    that Resonant had "regular calls with them to answer questions" and "work[] through" circuitry issues and "details of the design."

c.     In a March 10, 2015 presentation on Resonant at ROTH Capital Partners' 27th Annual Conference, held at the Ritz Carlton hotel in Laguna Niguel, California, Defendant Lingren described Resonant's relationship with Skyworks as a "very close working relationship", adding that "[w]e are working with this customer on a daily basis with the product teams."

150.  The facts set forth above in ¶149(a)-(c) *supra* further support an inference of the Resonant Defendants' *scienter*, by indicating that Resonant personnel – including, for the reasons set forth in "First" through "Fifth" above, Resonant's co-founders and/or senior officers – were in frequent communication

CONSOLIDATED SECOND AMENDED CLASS ACTION COMPLAINT

83

with Skyworks, and consequently were well-placed to understand: (a) exactly what specifications Resonant and Skyworks had agreed to; (b) exactly what Resonant had provided to Skyworks; (c) exactly how Resonant's product did or did not meet the agreed-upon specifications; and (d) exactly how Skyworks evaluated and judged Resonant's product.

151.   Eighth, and relatedly, the Development Agreement, as Amended and Restated on or about May 8, 2013, was signed by Defendant Lingren on or about May 9, 2013.   *See* January 24, 2014 Registration Statement, at Exhibit 10.35 [Development Agreement] at p. 9.  Consequently, Defendant Lingren can be charged with knowledge of the terms of the Development Agreement, including Skyworks' specifications pursuant to Exhibit C of the Development Agreement.

152.   Relatedly,   Defendant   Lingren's   awareness   of   the   requisite specifications – including specifications not set forth in the Development Agreement but subsequently agreed to by Skyworks and Resonant (pursuant to the Development Agreement) – is further indicated by his demonstrated ability, during Resonant conference calls with analysts and investors, to speak about such specifications knowledgeably.

153.   By Milestone 3, Resonant was well aware of the full Skyworks design specifications.  This is confirmed by industry custom (*see* Phinney Decl. ¶¶9, 15-16), but as also implied by Resonant's own IPO Prospectus.   *See* Resonant

Prospectus at 3.  At no time during the Exchange Based Class Period did Resonant claim that the specifications were materially changed (or changed in any way) after Milestone 3.  Thus, by the time Resonant had the full specifications, and in light of Resonant management team's years of industry experience and the Company's daily communications with Skyworks, the Resonant Defendants knew that the specifications were, in their opinion "very aggressive" and that it was highly unlikely that the Company would be able to meet the specifications.  At this time, the Resonant Defendants were also aware that nothing in the public literature that they had seen had satisfied the specifications (as Defendant Lingren belatedly informed the investing public on February 26, 2015).  Defendants also admitted on February 26, 2015 that when they submitted the final Milestone 4 design to Skyworks in January 2015, they knew that they had not been able to meet the specs.

154.   Ninth, the Resonant Defendants benefitted financially from misleading Resonant shareholders concerning the Development Agreement.  Specifically, the Resonant Defendants were able to avoid defaulting under a series of convertible notes by misrepresenting the Company's ability to produce a Duplexer to specification.

155.   In June 2013, Resonant LLC converted into a corporation, Resonant.  At that time, Resonant issued STI a $2.4 million subordinated convertible note (the "Subordinated Convertible Note").   The Subordinated Convertible Note was

scheduled to mature on September 17, 2014 and was secured by all of Resonant's assets.

156.   In addition to the Subordinated Convertible Note, Resonant issued $7.0 million of senior convertible notes (the "Senior Convertible Notes") in a private placement also in June 2013.  The Senior Convertible Notes were scheduled to mature on September 17, 2014, accrued interest at 6.0% per annum, and (similar to the Subordinated Convertible Note) was secured by all of Resonant's assets.

157.   Collectively, the Resonant Defendants faced approximately $9.5 million in note obligations (not including interest) scheduled to mature in September 2014.  Pursuant to the terms of these notes (which were attached to Resonant's January 24, 2014 Registration Statement as Exhibits 10.9 and 10.17), Resonant possessed the right to enforce conversion of the notes into common stock upon the occurrence of a "Qualifying IPO" (which was defined as an underwriting of common stock for the Company for public distribution resulting in gross proceeds of not less than $8 million).

158.   As of September 2014, Resonant was still a development stage company with a history of operating losses and no immediate means to revenue.  The Company had incurred accumulated losses from its inception totaling $19.0 million. At the same time, Resonant only held $7.6 million in cash and cash equivalents and was spending approximately $1.5 million per quarter in operating expenses.

Resonant's Prospectus included a "going concern qualification" from the Company's independent auditors, Squar, Milner, Peterson, Miranda & Williamson, LLP: "[T]he Company has suffered recurring losses from operations and has negative working capital and shareholders' deficit that raise substantial doubt about its ability to continue as a going concern." Resonant Prospectus at F-2.

159. Given the fact that the Company was not earning any revenue, the Resonant Defendants were forced to rely strictly on the value of their common stock as a means to obtaining future financing. Accordingly, the Resonant Defendants misled investors and analysts concerning the Company's ability to build a Duplexer to specification in order to inflate the value of Resonant's common stock. In so doing, the Resonant Defendants were able to generate enough interest in the Company to hold a successful initial public offering and, in turn, avoid default under its maturing Subordinated Convertible Note and Senior Convertible Notes. Without the Resonant Defendants' material omissions and/or misleading statements, Resonant would not be a going concern.

**F.    Loss Causation**

160. Defendants' materially misleading statements and omissions during the Exchange Act Class Period resulted in Plaintiffs and other members of the Exchange Act Class purchasing the Company's shares at artificially inflated prices, and thereby

directly or proximately caused, or were a substantial contributing cause, of the damages sustained by Plaintiffs and other members of the Exchange Act Class.

161.    As alleged herein:

a.    the market for Resonant's stock was open, well-developed and efficient at all relevant times (*see* Section VI.G *infra*);

b.    Defendants' above-detailed materially misleading statements and/or material omissions had the effect of creating in the market an unrealistically positive assessment of the Company and its prospects, thus causing the Company's shares to be overvalued and the market price of the Company's shares to be artificially inflated during the Exchange Act Class Period (*see* Sections IV and VI.A-D, *infra*);

c.    Plaintiffs and other members of the Exchange Act Class purchased or otherwise acquired Resonant stock relying upon the integrity of the market price for Resonant shares and market information relating to Resonant (*Id*.);

d.    Immediately following disclosures made by the Resonant Defendants on February 26 and April 2, 2015 that corrected the misleading statements made by Defendants during the Exchange Act Class Period and/or marked materialization of risks

CONSOLIDATED SECOND AMENDED CLASS ACTION COMPLAINT

concealed by Defendants during the Exchange Act Class Period, Resonant's share price suffered severe devaluation (*see* Sections VI.C-D, *supra*).

162.   In sum, the Resonant Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiffs and the Exchange Act Class.  During the Exchange Act Class Period, Plaintiffs and other Exchange Act Class members purchased Resonant's stock at prices artificially inflated by Defendants' materially misleading statements and omissions, and when the misleading statements that Defendants made to the market were corrected, and/or the information alleged herein to have been concealed from the market was revealed, the price of the Company's stock significantly declined, causing Plaintiffs' and Class Members' losses.

## G.   Applicability of Presumption of Reliance (Fraud-On-The-Market Doctrine)

163.   The market for Resonant's stock was open, well-developed and efficient at all relevant times.

a.   Resonant stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market.  During the Exchange Act Class Period, average daily trading volume exceeded 200,000 shares per day;

b.   as a regulated issuer, Resonant filed periodic public reports with the SEC and/or the NASDAQ;

c.   Resonant regularly communicated with public investors *via* established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

d.   Resonant was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

164.   As a result of the foregoing, the market for Resonant stock promptly digested current information regarding Resonant from all publicly available sources and reflected such information in Resonant's stock price, as evidenced by the price reactions to the February 26 and April 2, 2015 disclosures.

165.   Defendants' materially misleading statements and/or omissions of material fact caused Resonant shares to trade at artificially inflated prices during the Exchange Act Class Period.  Indeed, buoyed by Defendants' materially misleading

statements and/or omissions of material fact, Resonant shares more than tripled in price between Resonant's May 2014 IPO and early/mid-February 2015, rising from approximately $6 per share in May 2014 to exceed $15 per share during much of February 2015 (and approach $20 per share in mid-February 2015).

166.   Plaintiffs and other members of the Exchange Act Class purchased or otherwise acquired the Company's stock relying upon the integrity of its market price, which reflected all information available to the market concerning Resonant, including Defendants' materially misleading statements and material omissions, and have been damaged thereby.  When, at the end of the Exchange Act Class Period, the Resonant Defendants issued new public statements to the market that disclosed the facts previously omitted, and corrected the misleading statements previously issued, the artificial inflation was removed and the Company's share price collapsed (falling back to below $5 per share after April 2, 2015).

167.   Under these circumstances, all purchasers of Resonant's stock during the Exchange Act Class Period suffered similar injury through their purchase of Resonant shares at artificially inflated prices, and a presumption of reliance applies.

## H.   No Safe Harbor

168.   The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint.  The statements alleged to be false and misleading herein

all relate to then-existing facts and conditions.  In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Resonant who knew that the statement was false when made.

**FIRST CLAIM**
**Violation of Section 10(b) of**
**The Exchange Act and Rule 10b-5**
**Promulgated Thereunder Against the Resonant Defendants**

169.   Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

170.   During the Exchange Act Class Period, the Resonant Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Exchange Act Class Period, did:  (i) deceive the investing public,

including Plaintiffs and other Exchange Act Class members, as alleged herein; and (ii) cause Plaintiffs and other members of the Exchange Act Class to purchase Resonant shares at artificially inflated prices.   In furtherance of this unlawful scheme, plan and course of conduct, the Resonant Defendants, and each of them, took the actions set forth herein.

171.   The Resonant Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made materially misleading statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's stock in an effort to maintain artificially high market prices for Resonant shares in violation of Section 10(b) of the Exchange Act and Rule 10b-5.   The Resonant Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

172.   The Resonant Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Resonant's business, operations, products and prospects, as specified herein.

173.    The Resonant Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information, and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Resonant's business, operations, products and prospects, which included the making of, or the participation in the making of, materially misleading statements and/or omitting to state material facts necessary in order to make the statements not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's stock during the Exchange Act Class Period.

174.    Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts:  (i) the Individual Defendants were high-level executives and/or directors at the Company during the Exchange Act Class Period and members of the Company's management team or had control thereof; (ii) each of the Individual Defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of the Individual Defendants enjoyed significant personal contact and familiarity with the other Resonant Defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the

Company's finances, operations, and sales at all relevant times; and (iv) each of the Individual Defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially misleading and/or omitted material facts.

175.   The Resonant Defendants had actual knowledge of the materially misleading statements and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.   The Resonant Defendants' materially misleading statements and/or omissions were made knowingly or recklessly and for the purpose and effect of concealing Resonant's business, operations, products and prospects from the investing public and supporting the artificially inflated price of its shares.   The Resonant Defendants, if they did not have actual knowledge of the materially misleading statements and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were misleading or omitted material facts.

176.   As a result of the dissemination of the materially misleading information and/or failure to disclose material facts, as set forth above, the market price of Resonant's stock was artificially inflated during the Exchange Act Class Period.   In ignorance of the fact that market prices of the Company's shares were

artificially inflated, and relying directly or indirectly on the misleading statements made by the Resonant Defendants, or upon the integrity of the market in which the Company's stock trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by the Resonant Defendants, but not disclosed in public statements by the Resonant Defendants during the Exchange Act Class Period, Plaintiffs and the other members of the Exchange Act Class acquired Resonant stock during the Exchange Act Class Period at artificially high prices and were damaged thereby.

177.   At the time of said materially misleading statements and/or material omissions, Plaintiffs and other members of the Exchange Act Class were ignorant of their falsity, and believed them to be true.  Had Plaintiffs and the other members of the Exchange Act Class and the marketplace known the truth, which was not disclosed by the Resonant Defendants, Plaintiffs and other members of the Exchange Act Class would not have purchased or otherwise acquired their Resonant stock, or, if they had acquired such stock during the Exchange Act Class Period, they would not have done so at the artificially inflated prices which they paid.

178.   By virtue of the foregoing, the Resonant Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

179.   As a direct and proximate result of the Resonant Defendants' wrongful conduct, Plaintiffs and the other members of the Exchange Act Class suffered

damages in connection with their respective purchases and sales of the Company's stock during the Exchange Act Class Period.

## SECOND CLAIM
### Violation of Section 20(a) of
### The Exchange Act Against the Individual Defendants

180.   Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

181.   The Individual Defendants acted as controlling persons of Resonant within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly: the decision-making of the Company; the contents of Resonant's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors (*i.e.*, the market); and the content and dissemination of the various statements which Plaintiffs contend were materially misleading and/or omitted material facts.   The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.  Because of their positions and

access to material non-public information available to them, each of the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the misleading statements pleaded herein, as, to the extent those statements were "group-published" information, they were the result of the collective actions of the Individual Defendants

182. In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular acts giving rise to the securities violations as alleged herein, and exercised the same.

183. As set forth above, Resonant and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and/or omissions as alleged in this Complaint. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of the Individual Defendants' wrongful conduct, Plaintiffs and other members of the Exchange Act Class suffered damages in connection with their purchases of the Company's stock during the Exchange Act Class Period.

# VII.   SUBSTANTIVE ALLEGATIONS FOR SECURITIES ACT CLAIMS

184.   Plaintiffs repeat and reallege the allegations set forth in Sections II, III, IV (except for ¶40), and V as if fully set forth herein.

185.   These claims, brought under Sections 11 and 15 of the Securities Act, 15 U.S.C. §§ 77k and 77o, are asserted against the Securities Act Defendants on behalf of the Securities Act Class.

186.   For the purposes of the Securities Act claims, Plaintiffs allege that the Securities Act Defendants acted at least negligently in failing to identify materially untrue and/or misleading statements in the Offering Documents and take reasonable actions to correct the statements and/or prevent them from being disseminated to investors.  These Securities Act claims are based solely on claims of strict liability and/or negligence, and neither make nor incorporate any allegations of fraud or scienter.  These Securities Act claims are not based on any allegation that any of the Securities Act Defendants engaged in fraud or any other deliberate and intentional misconduct, and Plaintiffs specifically disclaim any reference to or reliance on fraud allegations.

187.   These Securities Act claims are brought on behalf of persons who purchased or otherwise acquired Resonant shares in or traceable to the Company's May 28, 2014 IPO.

188.   The IPO was conducted pursuant to the Registration Statement and Prospectus.  The SEC declared Resonant's Registration Statement effective on May 28, 2014.

189.   Defendant Lingren signed the Registration Statement.  Resonant was the issuer of the Resonant shares issued, offered and sold in the IPO pursuant to the Registration Statement.

190.   Defendant MDB was the Resonant IPO underwriter.  However, prior to serving as Resonant IPO underwriter, MDB previously served as the exclusive private placement agent for Resonant's June 2013 $7.0 million senior convertible notes financing.  MDB was also intimately involved in the Company's pre-IPO financing and operations.  For example, in a presentation entitled, "Maximizing the Value of Disruptive Technology", MDB describes how it, *inter alia*, assisted Resonant by:

- "spinning out technology and patents from original owner and forming new company";

- "recruiting key members of the team, including CEO and independent directors";

- assisting "with patent development and strategy";

- advising "on business and licensing strategy"; and

- "provid[ing] $7.0 million in pre-IPO financing."[7]

191.   Defendant Lingren independently acknowledged the significance of MDB's involvement during a January 2015 investor conference by describing how MDB provided a "fairly large seed []round" with the expectation that Resonant would "go public 9 to 15 months thereafter."   Thus, Resonant's May 2014 IPO occurred within the timeframe prescribed by MDB.

192.   Resonant sold 3,105,000 shares of common stock in the IPO at $6 per share.   Resonant's IPO was a firm commitment underwriting, meaning that MDB purchased all 3,105,000 shares of Resonant common stock in the IPO, and then sold the shares of Resonant common stock to the public.

193.   Resonant's Prospectus contained materially untrue and/or misleading statements and/or omissions concerning the Company's Development Agreement with Skyworks and, specifically, Resonant's ability to meet the Milestones contained therein.

194.   Resonant's Prospectus made the following materially untrue and/or misleading statements and/or omissions concerning the Company's Development Agreement with Skyworks:

[Prospectus, Page 3]

---

[7] *See* MDB Presentation, "Maximizing the Value of Disruptive Technology" at 28, *available at*:  http://www.mdb.com/assets/media/images/MDB%20Firm%20Overview%20Deck.pdf.

**Our First Commercial Duplexer Design**

We are currently developing our first commercial duplexer design in collaboration with Skyworks Solutions, Inc. pursuant to a development agreement. Skyworks is an innovator in high performance analog semiconductors and a leading supplier of RF front-ends for mobile devices. **Skyworks has developed a set of proprietary specifications for our duplexer based on the demands of its customers**. We expect to complete work on a production-ready duplexer design before the end of 2014. Skyworks has an option to license our duplexer design at already agreed-upon royalty rates upon completion. We will own our duplexer design and all related intellectual property.

. . .

[Prospectus, Page 11]

*We may not be able to complete a design that meets our potential customer's specifications. Even if we succeed in developing a design that meets all the specifications in our development agreement, our potential customer could decline to use our design in its product. Further, our customer's product could fail in the marketplace. Any of these events would have a material adverse effect on our business and potentially threaten our viability.*

**The development agreement with our one potential customer requires us to meet stringent performance specifications and compete against other technologies for inclusion into the potential customer's product**. Our potential customer's final product will then compete against other products and technologies for inclusion into mobile devices in the marketplace. **There can be no assurance that we can complete our design or that our final design will have acceptable performance and meet all specifications in our**

**development agreement**. The decision to use our design is solely within our potential customer's discretion. **Even if our design meets all the specifications in our development agreement, our potential customer could decline to use our design in its product**. Further, if selected for inclusion in its product by our potential customer, there is no guarantee that its final product will win out over its competition for inclusion into mobile devices. Either failure (to be selected at the design stage or the device stage) would have a material adverse effect on our business and potentially threaten our viability.

. . .

[Prospectus, Page 28]

We are currently developing our first design, a duplexer, in collaboration with Skyworks Solutions, Inc., under the terms of a development agreement. Duplexers are two filters combined into a single component which simultaneously selects both the transmit and receive signals. We expect to complete work on a production-ready duplexer design before the end of 2014. Skyworks has an option to license our duplexer design at already agreed-upon royalty rates upon completion. **There is no assurance that we can complete our design or that our design will have acceptable performance. In addition, our design will compete with other products and solutions available to Skyworks and may not be selected even if fully compliant with all specifications**.

. . .

[Prospectus, Pages 35-36]

***Our First Commercial Duplexer Design***

We are currently developing our first single-band commercial SAW duplexer design in collaboration with Skyworks under the terms of a development agreement. Skyworks is an innovator in high performance analog

CONSOLIDATED SECOND AMENDED CLASS ACTION COMPLAINT

103

semiconductors and a leading supplier of RF front-ends for mobile devices. Skyworks has developed a set of proprietary specifications for our duplexer based on the demands of its customers. **We believe our design will meet the performance requirements for the selected band but at less than half the cost of the existing BAW duplexer**. We have started with fixed band designs because we believe it gives us the opportunity to quickly demonstrate our ISN process.

The development agreement contains the following progress milestones:

- *Milestone 1 (Resonator Designs)*—Design a set of resonators, fabricate using an approved high volume manufacturer and provide test results.

- *Milestone 2 (First Duplexer Design)*—Design the first iteration of a fully-packaged duplexer, fabricate using the approved manufacturer, provide test results and deliver samples.

- *Milestone 3 (Second Duplexer Design)*—Design the second iteration of a fully-packaged duplexer, fabricate using the approved manufacturer, provide test results and deliver samples.

- *Milestone 4 (Production-Ready Duplexer Design)*—Design production-ready, fully-packaged duplexer, fabricate using the approved manufacturer, provide test results and deliver samples.

We completed Milestones 1 and 2 and are actively working on Milestone 3. **We expect to complete work**

**on a production-ready duplexer design before the end of 2014**.  We are funding our portion of the development work and will own our duplexer design and all related intellectual property.  Skyworks is funding certain costs and devoting engineering resources to testing and qualification

Skyworks has an option to license our duplexer design at already agreed-upon royalty rates upon completion.  We will own our duplexer design and all related intellectual property.  The terms of the license would give Skyworks exclusivity on our filter designs for a limited time on the relevant duplexer band.  The exclusivity will not affect our ability to design filters in other bands.

**There is no assurance that we can complete our duplexer design or that our design will have acceptable performance**.  **In addition, our design will compete with other products and solutions available to Skyworks and may not be selected even if fully compliant with all specifications**.

. . .

[Prospectus, Page 43]

Our primary activity in the near term will be continued work on a duplexer design under our existing development agreement with Skyworks.  **We expect to complete work on the duplexer design before the end of 2014.  There is no assurance that we can complete our design or that our design will have acceptable performance.  In addition, our design will compete with other products and solutions available to Skyworks and may not be selected even if fully compliant with all specifications**.

195.   The bold-faced statements identified immediately above, concerning the Development Agreement and Resonant's ability to meet Skyworks'

CONSOLIDATED SECOND AMENDED CLASS ACTION COMPLAINT

specifications, were materially misleading and/or omitted to state material facts requisite to render them not misleading, as a result of their failure to disclose the fact that the Skyworks' specifications were far stricter, technical and/or expansive than Resonant was capable of meeting; indeed, as Lingren later confirmed, the Skyworks' specifications were "very aggressive" to the point where they had not been met by *any* known product (including better-performing BAW filters).  Had the Securities Act Defendants properly and/or reasonably evaluated the Skyworks' specifications, the Securities Act Defendants would have realized at the time of the IPO that Skyworks' specifications were "very aggressive" and had not been met in any known product, and thus the Securities Act Defendants would have identified the materially untrue and/or misleading statements within the Offering Documents and either corrected them or prevented them from being disseminated to investors.

196.   The truth concerning the statements in the Prospectus began to emerge on February 26, 2015 when Resonant admitted that the design it submitted to Skyworks pursuant to Milestone 4 had not met Skyworks' specifications.  During an investor conference call later that day.   Defendant Lingren stated that the specifications set forth in or pursuant to the Development Agreement were "very aggressive," and had not been met by *any* known product (including better-performing BAW filters):

> Our next question comes from Quinn Bolton with Needham & Company.  Please proceed.

1
2
3

&lt;Q - Quinn Bolton&gt;: Terry, just a quick follow-up.  You talked about sort of set of specs that you're trying to reach.  Is there a BAW solution today that those specs are based on or is that almost an ideal set of specs that was the wish list that the customer had that perhaps even existing BAW filters might not achieve every spec.

4
5
6
7
8

&lt;A - Terry Lingren&gt;: Well, I have not evaluated every BAW in the industry in this band, whereas our customer probably has.  *These specs are very aggressive* and certainly for the size that we're targeting.  So, I don't know, I don't know for sure and I hesitate to speculate on the call.  *I do think that these are very aggressive specs, there is certainly nothing in the public literature we seen that meet all of the specs that are in ours at the moment.*

9
10
11

&lt;Q - Quinn Bolton&gt;: So some of the existing BAW filters that you've seen may not have met those specs either?  I'm not trying to put words in your mouth, but it sounds like that maybe a true statement.

12

&lt;A - Terry Lingren&gt;: It's possible.

13

[Italics added for emphasis]

14

197.   Likewise, as Defendant Lingren further stated during Resonant's

15

February 26, 2015 conference call, Resonant delivered a non-compliant product to

16
17

Skyworks because no matter how much more additional time Resonant could have

18

taken to try to meet the specifications, the specifications were very aggressive and

19
20

unlikely to be met, and the unlikelihood of meeting specifications aside, Resonant's

21

product was "competitive."

22
23

Our next question comes from Lou Basenese of Disruptive Tech Research.  Please proceed.

24
25

&lt;Q - Louis Basenese&gt;: Hey Terry, hey John. Can you give us any color around when you delivered the duplexer to the customer?

26
27
28

&lt;A - Terry Lingren&gt;: Well, we've been delivering designs all through the process, we have gone through that path 15 months or so of development work.  *The last design which we're calling the final version of this design was delivered within the last month.*

CONSOLIDATED SECOND AMENDED CLASS ACTION COMPLAINT
107

* * *

Our next question comes from [ph] Jeff Kone (28:02) with Wall Street Capital Partners. Please proceed.

<Q>: Hi, Terry. I wanted to get some more color on delivering the design, *why would you deliver a month ago if it didn't meet the specifications of the agreement? Why wouldn't you just continue working on it until it's done?* And the parts where it didn't meet, does that have to do with cost or efficiency or what type of area? Is it a material area where it didn't meet the agreement?

<A - Terry Lingren>: *The specs we're talking about are all performance specs* and it sounds like there are a lot but there aren't. It's around the – you have to understand filters and what all of the list of specifications that a particular part has to meet and some of those we don't. *But we thought that we had a design which was competitive. In addition, our customer's clock has – they're getting anxious, and so we felt we have a competitive product* and we have submitted that for their consideration.

<Q>: So, if you would have worked it out longer, could you've gotten to the point where it would satisfy the agreement or what was the problem there?

<A - Terry Lingren>: *We will continue to work on it.* As I've mentioned in one of my previous answers, we believe that there are – this is a continual evolution of specifications, including not only the segment performance, but size and cost, the way this market proceeds. *So we will always be working on this.* I think that this is part of the original development contract which is getting a little perhaps long in the tooth at this point. . .

[Italics added for emphasis]

198.   Thereafter, on April 2, 2015, after the market closed, Resonant:  (1) issued a press release entitled, "Resonant Inc. Provides Update on First Customer Relationship;" and (2) held a conference call with analysts and investors, beginning at 5:00 p.m. Eastern Standard Time.  Additionally, due to the "limited notice" provided to Resonant analysts and investors with respect to the April 2, 2015

1   conference call, Resonant held a second call on the same topic on April 6, 2015, at

2   1:00 p.m. Eastern Standard Time.

3
4       199.   Resonant's April 2, 2015 press release stated:

5   **Resonant Inc. Provides Update on First Customer Relationship**

6   **— Company to Host Conference Call Today at 5:00 p.m. Eastern Time —**

7

8   SANTA BARBARA, Calif.—April 2, 2015 — Resonant Inc. (NASDAQ: RESN), a late-stage development company creating innovative filter designs for radio frequency front-ends (RFFEs) for the mobile device industry, today provided an update on the relationship with and first design project for its first customer.

9
10
11

12   In February, Resonant management discussed the transition of its relationship with its first customer from development to commercialization. *This week, Resonant received notice that the development agreement with its first customer has been terminated,* and that Resonant must pursue commercialization of its designs with this customer by working directly with the filter manufacturer. Resonant intends to collaborate with the filter manufacturer to continue to submit improved product designs for consideration by this customer for insertion into its product modules.

13
14
15
16
17

18   Terry Lingren, Chairman, Co-Founder and CEO of Resonant, stated, "The Development Agreement has accomplished a principal purpose – to enable Resonant to develop a beyond-state-of-the-art filter design capability. This was only possible through sustained commitment from our first customer over the past several years. *While the probability has been reduced that our design will be selected for the customer's original target product,* we believe that the design for the band that we developed for the original product could be considered by this customer for use in next generation, follow-on modules. Additionally, as a result of the customer's termination of our development agreement, we are now permitted to market the design for the same band to other potential customers.

19
20
21
22
23
24
25

26   We would like to reiterate that we are on track to develop a filter design for our second customer that we expect to deliver in less than a year. We also expect to complete our prototype tunable filter before year end, as planned.

27
28

CONSOLIDATED SECOND AMENDED CLASS ACTION COMPLAINT

Resonant's thesis and business model remain unchanged. By the end of this year, we expect to have multiple products in development for consideration by several customers. *Given recent developments with our first customer, however, we are re-evaluating our prior guidance regarding the timing of receipt of our first revenues.*

Conference Call Details

Resonant will host a conference call today at 5:00 p.m. Eastern time (2:00 p.m. Pacific time) to answer any investor questions related to this announcement. . .

[Bold in original; italics added for emphasis]

200. Resonant's April 2, 2015 press release stated:

    a.    that, as a result of Resonant's submission of an RF filter design that failed to meet the agreed-upon specifications set forth pursuant to the Development Agreement, Skyworks had elected to terminate the Development Agreement – an election that was not merely an "option" for Skyworks under the Development Agreement, but rather constituted, as the Development Agreement itself stated, Skyworks' "sole remedy and recourse," under the Development Agreement, in the event that Resonant provided it with product that "does not conform to the specifications, success criteria or requirements" set forth in or pursuant to the Development Agreement;

    b.    that, in light of Skyworks exercise of such "sole remedy and recourse" to terminate the Development Agreement, "the

probability has been reduced that our design will be selected for the customer's original target product;"

    c.    that, in light of the fact that it Skyworks was now less likely to use Resonant's RF filter in Skyworks' current generation of RF front ends, the prospects for any revenue flows from such product or from Skyworks had receded, and that Resonant was therefore "re-evaluating our prior guidance regarding the timing of receipt of our first revenues."

201.    These post-close April 2, 2015 disclosures constituted further corrective disclosure of the materially misleading statements and material omissions made in the IPO Offering Documents, and/or a further materialization of risks that had not been disclosed in the Offering Documents.

202.    The materiality of the misleading statements and omissions is evidenced by the market's severe devaluation of Resonant shares following the April 2, 2015 corrective disclosure.  On the immediately-following trading day, April 6, 2015, Resonant shares lost 40.3% of their value, falling $2.98 per share from their April 2, 2015 closing price of $7.39 to close on April 6, 2015 (the subsequent trading day) at $4.41per share.  Notably, the April 2, 2015 corrective disclosure caused Resonant share price to fall substantially below its IPO price.

203. On September 24, 2015, the date of the first filing of claims pursuant to the Securities Act in this action, Resonant's stock price closed at $4.82.

204. The misrepresentations in and/or omissions from the Offering Documents were a product of conduct that was at least negligent.

205. As underwriter of Resonant's IPO, MDB was expected and required to perform an adequate and reasonable investigation into Resonant's business and operations (*i.e.*, a "due diligence" investigation). MDB failed to perform adequate due diligence, and/or was negligent in failing to ensure that the Registration Statement was prepared properly and accurately.

206. As discussed above (*see* ¶¶190-91), MDB was intimately involved in Resonant's the financial and operational affairs well before Resonant's IPO. Prior to serving as Resonant IPO underwriter, MDB previously served as the exclusive private placement agent for Resonant's June 2013 $7.0 million senior convertible notes financing. MDB was also intimately involved in, *inter alia*, assisting Resonant in migrating intellectual property from its original owner, developing its patent and licensing strategy and even in employee recruiting. Thus, MDB was far more involved in Resonant's affairs than a typical securities underwriter and its familiarity with Resonant indisputable.

**THIRD CLAIM**
**Violation of Section 11 of the Securities Act**
**Against the Securities Act Defendants**

207.    Plaintiffs repeat and reallege the allegations contained above in ¶¶184-206.

208.    As set forth above, Resonant's Offering Documents contained untrue and/or incorrect statements of material fact and omitted material facts required to be stated in order to make the statements contained therein accurate.

209.    Resonant is the registrant for the IPO.  As issuer of the shares, Resonant is strictly liable to Plaintiffs and to the members of the Securities Act Class for the materially untrue statements and material omissions alleged herein.

210.    Resonant's Registration Statement was signed by Defendant Lingren on behalf of the Company.

211.    MDB was the underwriter for Resonant with respect to Resonant stock offered in the IPO.

212.    Plaintiffs and the other members of the Securities Act Class purchased Resonant common stock in or traceable to the IPO.

213.    Plaintiffs and the other members of the Securities Act Class were damaged by Resonant, Lingren, and MDB as a direct and proximate result of the untrue statements and omissions in the Registration Statement.

214.    This claim was brought within the applicable statute of limitations.

215.   By reason of the foregoing, Resonant, Lingren, and MDB have violated Section 11 of the Securities Act and are liable to Plaintiffs and the other members of the Securities Act Class.

## FOURTH CLAIM
### Violation of Section 15 of the Securities Act
### Against Defendant Lingren

216.   Plaintiffs repeat and reallege the allegations contained above in ¶¶184-215.

217.   Lingren participated in the operation and management of Resonant at the time of the IPO and conducted and participated, directly and indirectly, in the conduct of Resonant's business affairs.

218.   Lingren was involved in the day-to-day operations of the Company at the highest levels.

219.   Lingren was privy to confidential proprietary information concerning the Company and its business and operations.

220.   Lingren was a senior officer and director of Resonant.  Due to his position of control and authority, Lingren was able to, and did, control the contents of the Offering Documents that contained materially false and inaccurate information and/or omitted material information.

221.   Lingren signed the Registration Statement.

222.   Lingren was a controlling person of Resonant under the Securities Act.

223.   Resonant's conduct, as alleged herein, constitutes a violation of Section 11 of the Securities Act.  Lingren is liable to Plaintiffs and the other members of the Securities Act Class, jointly and severally with and to the same extent as Resonant, for violations under Section 15 of the Securities Act.

## VIII.  PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

(a)   determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)   appointing Plaintiffs as representatives of the Classes, and appointing the law firms listed below as Class counsel;

(c)   awarding compensatory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(d)   awarding Plaintiffs and the Classes their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(e)   such other and further relief as the Court may deem just and proper.

## **JURY TRIAL DEMANDED**

Plaintiffs hereby demand a trial by jury.

Dated:  February 23, 2016          **GLANCY PRONGAY & MURRAY LLP**

By:   _/s/ Robert V. Prongay_
Lionel Z. Glancy (#134180)
Robert V. Prongay (#270796)
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone:  (310) 201-9150
Facsimile:   (310) 201-9160
Email:  lglancy@glancylaw.com
Email:  rprongay@glancylaw.com

Jeff S. Westerman (#94559)
**WESTERMAN LAW CORP**
1875 Century Park East, Suite 2200
Los Angeles, California 90067
Telephone: (310) 698-7880
Facsimile: (310) 775-9777
Email:  jwesterman@jswlegal.com

*Liaison Counsel for Plaintiffs*

Ira M. Press (admitted *Pro Hac Vice*)
Thomas W. Elrod
**KIRBY McINERNEY, LLP**
825 Third Avenue, 16th Floor
New York, NY 10022
Telephone:  (212) 371-6600
Facsimile: (212) 751-2540
Email: ipress@kmllp.com
Email: telrod@kmllp.com

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Nicholas I. Porritt
Adam M. Apton
**LEVI & KORSINSKY LLP**
1101 30th Street NW, Suite 115
Telephone:  (202) 524-4290
Facsimile: (202) 337-1567
Email: nporritt@zlk.com
Email: aapton@zlk.com

*Co-Lead Counsel for Plaintiffs*

**PROOF OF SERVICE VIA ELECTRONIC POSTING PURSUANT TO CENTRAL DISTRICT OF CALIFORNIA LOCAL RULES AND ECF GENERAL ORDER NO. 10-07**

I, the undersigned, say:

I am a citizen of the United States and am employed in the office of a member of the Bar of this Court. I am over the age of 18 and not a party to the within action. My business address is 1925 Century Park East, Suite 2100, Los Angeles, California 90067.

On February 23, 2016, I caused to be served the following document:

**CONSOLIDATED SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

By posting the document to the ECF Website of the United States District Court for the Central District of California, for receipt electronically by the parties as listed on the attached Service List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on February 23, 2016, at Los Angeles, California.

*s/ Robert V. Prongay*
Robert V. Prongay

316177.1 RESONANT

# Mailing Information for a Case 2:15-cv-01970-SJO-VBK John Paggos v. Resonant, Inc. et al

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Adam M Apton**
  aapton@zlk.com

- **Kevin M Askew**
  kaskew@orrick.com,PATeam2@orrick.com

- **Lionel Zevi Glancy**
  lglancy@glancylaw.com

- **James N Kramer**
  jkramer@orrick.com,jthompson@orrick.com

- **Jennifer Pafiti**
  jpafiti@pomlaw.com,ahood@pomlaw.com,kmsaletto@pomlaw.com,disaacson@pomlaw.com,abarbosa@pomlaw.com

- **Nicholas I Porritt**
  nporritt@zlk.com

- **Ira M Press**
  ipress@kmllp.com

- **Robert Vincent Prongay**
  rprongay@glancylaw.com,CLinehan@glancylaw.com,info@glancylaw.com,echang@glancylaw.com,bmurray@glancylaw.com

- **Laurence M Rosen**
  lrosen@rosenlegal.com

- **Casey Edwards Sadler**
  csadler@glancylaw.com,info@glancylaw.com

- **Howard G Smith**
  howardsmith@howardsmithlaw.com

- **Robert David Weber**
  robert.weber@dlapiper.com,susan.byrd@dlapiper.com,docketingla@dlapiper.com

- **Perrie M Weiner**
  perrie.weiner@dlapiper.com,susan.byrd@dlapiper.com,docketingla@dlapiper.com

- **Jeff S Westerman**
  jwesterman@jswlegal.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)